UNITED STATES of America,
Plaintiff,

v.

PABST BREWING COMPANY, Schenley Industries, Inc., the Val Corporation, Defendants.

No. 59–C–215.

United States District Court
E. D. Wisconsin.
Sept. 22, 1964.

Earl A. Jinkinson, Bert Long, Francis C. Hoyt, Department of Justice, Anti-Trust Division, Chicago, Ill., for plaintiff.

John T. Chadwell, Snyder, Chadwell, Keck, Kayser & Ruggles, Chicago, Ill., Ray T. McCann, Milwaukee, Wis., for Pabst Brewing Co.

Leonard J. Emmerglick, Washington, D. C., Ralph Hoyt, Milwaukee, Wis., for Schenley Industries and Val Corp.

TEHAN, Chief Judge.

On or about July 30, 1958, Pabst Brewing Company acquired the assets and business of Blatz Brewing Company, a wholly owned subsidiary of Schenley Industries, Inc., for approximately $11,000,-000 in cash, $3,500,000 in debentures, 200,000 shares of Pabst common capital stock and a stock purchase warrant for an additional 350,000 shares of such stock. On October 1, 1959, the United States of America filed a complaint in this court pursuant to § 15 of the Clayton Act (Title 15 U.S.C. § 25) alleging that the effect of that acquisition may be substantially to lessen competition or to tend to create a monopoly in the production and sale of beer in the United States, the State of Wisconsin, and the three state area of Wisconsin, Illinois and Michigan in violation of § 7 of the Clayton Act (Title 15 U.S.C. § 18) and asking in part that the court adjudge the acquisition to be illegal and require Pabst to divest itself of the business and assets of Blatz.[1]

Prior to the trial, an intensive pre-trial program produced considerable agreement between the parties. It was agreed that the line of commerce involved herein is the beer industry, meaning the production, sale and distribution of beer and that the continental United States is a relevant geographic market for purposes of this case. Jurisdiction and venue were admitted by Pabst, as was the fact that prior to the acquisition both Pabst and Blatz sold beer in interstate commerce, which Pabst continues to do. Is-

1. The defendant, Val Corporation, formerly Blatz Brewing Company, and the defendant, Schenley Industries, Inc., have been joined and retained in this action solely for purposes of relief. (See United States v. Pabst Brewing Company (E.D.Wis.,1960) 183 F.Supp. 220)

sue remained, however, as to whether the State of Wisconsin and the three state area of Wisconsin, Illinois and Michigan are also appropriate sections of the country within which the probable effect of the acquisition is to be judged, Pabst claiming, contrary to the plaintiff's allegations, that the only relevant market area is the continental United States. There was also no meeting of the minds on the probable effect of the acquisition, Pabst denying that the effect thereof may be substantially to lessen competition in the areas advanced by the plaintiff as relevant and alleging that the purpose thereof was to avoid the consequences of Pabst's declining sales and increasing losses [2] and to preserve and promote competition and that the effect thereof was to preserve and promote competition. The plaintiff therefore faced at the trial the burden of proving, as it alleged, that Wisconsin and the three state area of Wisconsin, Illinois and Michigan are sections of the country within which the probable effect of the acquisition of Blatz by Pabst is to be examined and that the probable effect of that acquisition may be substantially to lessen competition or to tend to create a monopoly in the beer industry in either the continental United States or, if proved to be relevant market areas, in the State of Wisconsin or the three state area.

### PRE-TRIAL OCCURRENCES.

After issue was joined, a series of pre-trial conferences was held to prepare this case for trial on the issue of whether § 7 had been violated. It was determined that a hearing on the type of relief to be afforded, if any, would await this court's decision on the substantive issue. It was further determined that prior to trial the plaintiff would identify the persons it had interviewed in connection with this case and those it intended to call as witnesses and would identify all documentary evidence upon which it would rely and that Pabst would make similar revela-

tions to the plaintiff. Pursuant to the court's pre-trial directions, the plaintiff listed seventy-one persons whom it proposed to call as witnesses at the trial.

When this case was originally scheduled for trial on October 14, 1963, by order of May 7, 1963, it was estimated that the trial would last two months, such estimate being based in part on the plaintiff's expression of intention to call seventy-one witnesses. Thereafter, the trial was rescheduled twice, finally for January 27, 1964, and since the plaintiff still indicated that it would call seventy-one witnesses, no change was made in the trial estimate.

On January 3, 1964, the plaintiff and Pabst each moved for an order granting permission to issue subpoenas to witnesses residing more than 100 miles from Milwaukee and outside of this district. In the plaintiff's motion, its counsel stated:

"All such witnesses are believed by the plaintiff to have evidence material to the issues of this cause, and that the testimony of said witnesses is necessary to establish the alleged violations of the charges and allegations contained in the complaint filed in the above case." (sic)

On January 13, 1964, the plaintiff filed its pre-trial brief reiterating its belief in the importance and essentiality of the testimony of its witnesses as follows:

"In the course of proving the facts about the 'industry context' required by the Brown Shoe opinion [Brown Shoe Co. Inc. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510], the Government will call brewer witnesses to testify about the actual competitive situation in the beer industry. This is an invaluable and time honored mode of evidence in antitrust cases where the effect on competition is an issue. See for instance, United States v. Philadelphia National Bank et al., supra [374 U.S.

---

2. The plaintiff moved to strike this "failing enterprise" defense, contending that it was available only when the acquired, not the acquiring entity was failing. This motion was denied. (See order of March 31, 1961)

321], at pages 367–369 [83 S.Ct. 1715, at pages 1743–1745, 10 L.Ed. 2d.915]. These brewers deserve the close attention of the court not only because of their intimate knowledge of actual competitive conditions, but also because they represent companies which were the particular object the Anti-Merger Act sought to protect. These witnesses will show that the brewing industry is still, to some extent at least, an industry where control remains in the local community in the independent small company. Some of these witnesses will also testify as to the probable effect of changes in Blatz prices. This is perfectly proper under Section 7 which by its very nature looks to the future as already pointed out by the word 'may.' The Court is called on in deciding these cases to predict the future and to do so must receive all the help it can get from industry representatives. The best source lies in industry experts, men long versed in the problems of breweries. Some of the Government's brewery witnesses in Wisconsin will testify that if Pabst ever cuts either the Pabst or Blatz prices to the level of their own, they would immediately be forced out of business. This is not subject to the objection that it is speculative because it comes from experts and will be received after a proper foundation is laid. We will prove that in other areas other breweries have been adversely affected by the lowering of Pabst or Blatz prices to the level of their own." (Pages 27–28)

\* \* \* \* \* \*

"The testimony of distributors presented in this case will be generally similar to that approved by the Court of Appeals in Crown Zellerbach Corporation v. Federal Trade Commission, 296 F.2d 800 (C.A.9, 1961) cert. den. 370 U.S. 937 [82 S.Ct. 1581, 8 L.Ed.2d 807] (1962). That case involved the merger of two paper producers which resulted in the cutting off of an important source of supply to independent paper jobbers. The court at pages 828–830 discussed at length the testimony of jobbers about how their businesses had been injured by the merger and upheld the Federal Trade Commission's finding of lessening competition." (Page 32)

Also on January 13, 1964, a final conference was held at the request of counsel at which the plaintiff again affirmed its intention to call witnesses and both the plaintiff and Pabst agreed to furnish opposing counsel with a list of witnesses to be called each week, and the order of their expected appearance, by Wednesday of the preceding week. An order respecting that agreement was submitted by the parties, and was received and signed by the court on January 20,. 1964.

On January 23, 1964, two court days before the trial was to commence, the court received a letter from counsel for the plaintiff, dated January 22, 1964, the day the plaintiff was to furnish its list of witnesses for the first week of trial,. which letter stated:

"Pursuant to the final pre-trial order, the list of plaintiff's witnesses for the week beginning January 27, 1964 is to be furnished to defense counsel on January 22, 1964. As was indicated to some extent at the last pre-trial conference, attorneys for the Government have been assiduously attempting to reduce the number of witnesses and thus narrow the issues.

"It is now the decision of the Government that this case well lends itself to trial as a purely documentary case with no live witnesses.

"The purpose of this letter is to inform the Court and defense counsel of this decision and the resulting sharp curtailment of the length of trial required for the Government's case. We now consider it probable that the Government will rest within two days commencing on January 27, 1964."

No explanation was volunteered by the plaintiff for this drastic change of position regarding the desirability and necessity of testimony of many witnesses to establish its case and only when counsel was pressed for an explanation by the court on April 30, 1964 was any attempt at explanation made. With respect to this matter, we understand the plaintiff's position to be that it decided to call no witnesses at the trial because the state of the law had been clarified recently to the extent that statistics satisfied the plaintiff's burden of proof. We must here note that the only significant recent clarifications in the merger field prior to January 22, 1964, when the plaintiff decided to call no witnesses, were Brown Shoe Co. Inc. v. United States (1962) 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 and United States v. Philadelphia National Bank, et al. (1963) 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915. Both of these cases were decided long before January 22, 1964 and the familiarity of plaintiff's counsel with them prior to that date is revealed in the plaintiff's pre-trial brief.

## THE TRIAL.

The trial began on January 27, 1964, at 10:45 A.M., with opening statements. At approximately 2:30 P.M., the plaintiff began presenting its case, that is, offering exhibits and reading portions of depositions. It rested at about 3:45 P.M. the following day, after offering some 260 exhibits, whereupon the defendant Pabst filed a motion to dismiss pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. Briefs with respect to that motion were filed, a hearing was held on April 30, 1964, proposed findings and comments thereon were filed, and the court is now prepared to render its decision.

## PABST AND BLATZ.

When it acquired Blatz in 1958, Pabst already operated four brewery plants, one, the largest, in Milwaukee, Wisconsin, one in Peoria Heights, Illinois, one in Newark, New Jersey, and one in Los Angeles, California. Blatz operated but one plant, in Milwaukee, Wisconsin, which plant was placed on a shut-down status in 1959, with Blatz brand beer being brewed thereafter at the four Pabst plants.

In 1957, the last full year prior to the acquisition, Pabst ranked tenth in sales of beer in the United States with 3.02% of the market and in 1958, its rank was eleventh, with 2.67% of the market. Blatz was the eighteenth largest selling brewery in the United States in 1957 with 1.47% of the market and the thirteenth largest selling brewery in 1958 with 2.04% of the market. In 1957, Pabst beer, under various brand names, was sold throughout the continental United States and Blatz beer was sold in 38 states and in the District of Columbia. In earlier years Blatz beer had been sold throughout the continental United States.

## THE PLAINTIFF HAS NOT SATISFIED ITS BURDEN OF PROVING THAT WISCONSIN OR THE THREE STATE AREA IS A RELEVANT GEOGRAPHIC MARKET.

Both the plaintiff and Pabst have cited with conviction the following language from the Brown Shoe case, in support of their respective positions as to the relevant market area:

"Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both 'correspond to the commercial realities' of the industry and be economically significant." 370 U.S. 294, at pages 336–337, 82 S.Ct. 1502, at page 1530.

Each maintains strenuously that a proper application of this standard must result in a determination that its position with respect to the relevant geographic market or markets is correct.

Since the parties are agreed that the continental United States is a relevant

geographic market, we shall not in this section of our opinion discuss the facts pertaining to that area. We shall discuss separately the pertinent facts regarding the disputed areas of Wisconsin and the three state area of Wisconsin, Illinois and Michigan and our reasons for determining that it has not been proved that either of those areas is a relevant geographic market within which the probable effect of the acquisition of Blatz by Pabst should be tested.[3]

## WISCONSIN.

Since the repeal of prohibition in 1933, Wisconsin has consistently ranked among the top three states in the production of beer. Statistics presented by the plaintiff on taxpaid withdrawals [4] from 1933 through 1961 and on production from 1935 through 1961 reveal this fact and reveal that in 1957, Wisconsin ranked second in production and taxpaid withdrawals of beer with over 11,000,000 barrels, in 1958 it ranked first with over 11,000,000 barrels, in 1959 and 1960 it ranked second with over 10,000,000 barrels and in 1961, with taxpaid withdrawals over 10,000,000 and production over 11,000,000 barrels, it again ranked second. From 1957 through 1961, total national taxpaid withdrawals grew from over 84,200,000 barrels to almost 89,000,000, Wisconsin's percentage thereof ranging from 11.45% (1960) to 13.08% (1958), and total national production grew from over 89,300,000 barrels to almost 95,000,000 barrels, Wisconsin's percentage thereof ranging from 11.34% (1960) to 13.18% (1958).

In beer consumption in the United States, Wisconsin ranked either eighth, ninth or tenth for each of the years 1934 through 1961, and its ranking for 1957 through 1961 was ninth.[5] During each of those latter years, over 83,700,000 barrels of beer were consumed nationally, Wisconsin consuming between 3.66% and 3.75% thereof.

From 1935 through 1961, the production of beer in Wisconsin far exceeded Wisconsin consumption of beer. For example, during the years 1957 through 1961, the number of barrels produced and consumed in Wisconsin were:

| Year | Barrels Produced | Barrels Consumed |
|------|------|------|
| 1957 | 11,735,362 | 3,066,673 |
| 1958 | 11,868,224 | 3,112,955 |
| 1959 | 10,737,424 | 3,198,468 |
| 1960 | 10,589,589 | 3,267,348 |
| 1961 | 11,198,894 | 3,303,154 |

And the Wisconsin consumer did not limit himself to Wisconsin brewed beer, but drank freely of beers brewed by out of state brewers. It is obvious, therefore, that the great bulk of Wisconsin's production of beer was consumed outside of that state.

During 1955, beer was sold in Wisconsin by 77 breweries. The number of breweries operated in that state in that year was 43. During 1956, beer was sold in Wisconsin by 74 breweries and 43 breweries were operated in that state. During 1957, beer was sold in Wisconsin by 69 breweries and 38 breweries were operated in that state. During 1958, beer was sold in Wisconsin by 68 or 69 breweries and 38 breweries were operated in that state. During 1959, beer was sold in Wisconsin by 60 breweries and 38 breweries were operated in that state.

3. Some variances exist in the exhibits with respect to the statistics hereinafter presented, but it does not appear that the variances are material.

4. "Taxpaid withdrawals" means the output of breweries on which the federal excise tax of $9.00 per barrel is paid.

5. In per capita consumption of malt beverages, Wisconsin's ranking for those latter years was first. In 1961, 39% of the beer sold in Wisconsin, or ten gallons per person was draught beer, and the national average of draught beer sold was 19% of the beer sold, or 2.8 gallons per person. Per capita consumption of draught beer in Wisconsin in that year was higher than in any other state reporting that statistic.

During 1960, beer was sold in Wisconsin by 58 breweries and 33 breweries were operated in that state. During 1961, beer was sold in Wisconsin by 54 breweries and 33 breweries were operated in that state.

Both before and after the acquisition, Pabst and Blatz found the Wisconsin consumer appreciative of their products. Their rankings in sales and percentages of total beer sales in Wisconsin from 1955 through 1961 were as follows:

| | PABST | | BLATZ | | PABST-BLATZ | |
|------|-------|---------------|------|---------------|------|---------------|
| | Rank | % of Wis. sales | Rank | % of Wis. sales | Rank | % of Wis. sales |
| 1955 | 3rd | 10.51% | 1st | 14.01% | | |
| 1956 | 4th | 10.86% | 1st | 12.72% | | |
| 1957 | 4th | 11.14% | 1st | 12.81% | | |
| 1958 | 4th | 10.73% | 1st | 12.99% | | |
| 1959 | | | | | 1st | 24.80% |
| 1960 | | | | | 1st | 26.14% |
| 1961 | | | | | 1st | 27.41% |

The total number of barrels sold of Pabst and Blatz nationally and the number sold in Wisconsin for the years 1949 through 1961 were as follows:

| | PABST | | BLATZ | |
|------|-----------|-----------|-----------|-----------|
| | National | Wisconsin | National | Wisconsin |
| 1949 | 4,336,378 | 302,556 | 1,545,622 | 491,626 |
| 1950 | 3,763,395 | 295,203 | 1,650,071 | 574,302 |
| 1951 | 3,901,571 | 271,682 | 1,665,281 | 567,726 |
| 1952 | 4,076,816 | 301,914 | 1,551,523 | 607,589 |
| 1953 | 3,925,757 | 283,347 | 989,288 | 430,285 |
| 1954 | 3,263,033 | 304,036 | 923,583 | 427,609 |
| 1955 | 3,129,452 | 324,596 | 907,836 | 432,510 |
| 1956 | 3,017,552 | 333,539 | 937,241 | 389,410 |
| 1957 | 2,548,452 | 340,378 | 1,239,334 | 388,678 |
| 1958 | 2,254,001 | 333,244 | 1,717,489 | 403,437 |
| (After acquisition) | | | | |
| 1959 | 2,060,775 | 374,764 | 2,133,546 | 416,322 |
| 1960 | 1,952,130 | 429,402 | 2,426,440 | 424,327 |
| 1961 | 2,667,346 | 475,490 | 2,524,716 | 429,772 |

Throughout those years, more Blatz beer was sold in Wisconsin than in any other state, except in the years 1958 through 1961, when Wisconsin sales of Blatz were exceeded by Blatz sales in Michigan. In none of those years except 1960, was Wisconsin the largest state market for Pabst.

In the years 1955 through 1960 the following amounts were spent by Pabst for advertising and promoting of Pabst beer nationally and in Wisconsin:

| | National Advertising | Wisconsin Advertising |
|------|----------------------|-----------------------|
| 1955 | $7,261,270 | $436,427 |
| 1956 | 8,450,316 | 557,722 |
| 1957 | 8,640,857 | 787,924 |
| 1958 | 6,309,002 | 558,751 |
| 1959 | 5,492,752 | 647,468 |
| 1960 | 5,724,267 | 779,472 |

The following amounts were spent by Pabst in 1959 and 1960 for advertising and promoting of Blatz beer:

| | National Advertising | Wisconsin Advertising |
|------|----------------------|-----------------------|
| 1959 | $4,185,697 | $ 986,817 |
| 1960 | 5,113,295 | 1,001,020 |

After the acquisition, the price charged distributors in Wisconsin for "Blatz Pilsner" brand beer on packages of twenty-four-12 oz. returnable bottles, F.O.B. brewery, was generally higher than that charged elsewhere.

The plaintiff contends that Wisconsin is a relevant market for purposes of this case because (a) prior to the acquisition, the most intense competition between Pabst and Blatz existed in Wisconsin, therefore the impact of the acquisition would be most severe in that state, (b) Wisconsin's standing in the beer industry makes it an appreciable segment of the market, (c) each state is a separate relevant market, since each state has its own regulations affecting the beer industry, (d) Blatz prices are kept higher in Wisconsin than in any other state, and (e) Wisconsin's high per capita consumption of beer, high consumption of draught beer and large number of small, locally owned [6] breweries make it a unique market. In support of its position that Wisconsin is a geographic submarket within which the effects of the acquisition may be tested it cites the Brown Shoe case, supra, the Philadelphia Bank case, supra, United States v. Bethlehem Steel Corporation and Youngstown Sheet and Tube Company (S.D., N.Y., 1958) 168 F.Supp. 576; Crown Zellerbach Corporation v. Federal Trade Commission (C.A.9, 1961) 296 F.2d 800; United States v. El Paso Natural Gas Co., (1964) 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12, and United States v. First National Bank & Trust Co. of Lexington (1964) 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1. While we agree that in a proper case the effects of a merger or ac-

quisition should be tested in a geographic submarket, we do not believe that the plaintiff has introduced evidence sufficient to prove that the State of Wisconsin is a geographic submarket which corresponds to the commercial realities of the beer industry or is economically significant. In our opinion, all of the cases relied upon by the plaintiff on this issue involved fact situations substantially different from the facts involved in this case.

In both the Philadelphia Bank case, where the four-county Philadelphia metropolitan area was held to be the proper section of the country in which to appraise the merger between the second and third largest banks in that area, and the Lexington Bank case [7] where a one county area was held to be the section of the country within which to test the effect of a consolidation of the first and fourth largest banks in that area, the line of commerce discussed by the Supreme Court was commercial banking. The records in both cases established that competition was localized by the factor of inconvenience. As the Supreme Court stated in the Philadelphia Bank case,

> "In banking, as in most service industries, convenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance. See Transamerica Corp. v. Board of Govs. of Fed. Res. Sys., 206 F.2d 163, 169 (C.A. 3rd Cir., 1953). The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries." 374 U.S. 321, at page 358, 83 S.Ct. 1715, at page 1738.

The beer industry is not a service industry and there is no evidence in this record that competition in the beer industry is in any manner localized or affected by location of a brewery. Absent such evi-

---

6. There is no evidence in the record that any small brewery located in Wisconsin is locally owned.

7. This case involved Sections 1 and 2 of the Sherman Act and not Section 7 of the Clayton Act.

dence, neither Bank case is authority here for the proposition that Wisconsin is a relevant geographic market.

The El Paso Gas case, cited by the defendant on oral argument, is of no assistance to us. It is not clear that there was even any issue as to whether California was a "section of the country".

The Brown Shoe case involved a merger between two companies each of which both manufactured and retailed shoes. With respect to the vertical aspect of the merger, the entire nation was held to be the relevant geographic market, (370 U.S. 294, at page 328, 82 S.Ct. 1502, at page 1525) as it was with respect to the horizontal aspect of the merger on the manufacturing level, the Supreme Court stating:

"The parties do not dispute the findings of the District Court that the Nation as a whole is the relevant geographic market for measuring the anticompetitive effects of the merger viewed vertically *or of the horizontal merger of Brown's and Kinney's manufacturing facilities. As to the retail level, however, they disagree.*" 370 U.S. 294, at page 337, 82 S.Ct. 1502, at page 1530. (Emphasis added.)

The court's subsequent holding and agreement with the district court that the relevant geographic markets in which to analyze the merger were cities with populations exceeding 10,000 and their environs in which both Brown and Kinney retailed shoes through their own outlets related only to the retail level of the merging companies' operations. The record before us does not reveal that Pabst or Blatz competed or were likely to compete at the retail level through controlled outlets in any area prior to the acquisition. Rather, it appears that their sales of beer were made primarily through distributors or wholesalers. The breweries' relationship with these distributors and wholesalers has not been revealed, nor has the relationship of retail outlets to either the breweries or the distributors or wholesalers. Absent any evidence as to retail activities on the part of Pabst or Blatz, Brown Shoe's rule that on the retail level the effect of the merger involved could be analyzed in local areas or geographic submarkets is of no aid to the plaintiff.

In the Crown Zellerbach case, in which the Court of Appeals for the Ninth Circuit held that relevant market area within which the effects of the acquisition by Crown Zellerbach Corporation of the stock and assets of St. Helens Pulp and Paper Company were to be examined was the three state area of Washington, Oregon and California, the record supported a finding that "the great bulk of the domestic sales, of the papers involved, by Crown and St. Helens" (296 F.2d 800, at page 816) were made in that three state area. In 1952, the year before the acquisition, 71.7% of St. Helens' sales of relevant products were in that area and that area was St. Helens' "predominant and outstanding market." (296 F.2d 800, at page 817) The record in this case does not reveal that Wisconsin held a comparable position with respect to either Pabst or Blatz beer sales. In 1957, 340,378 of the 2,548,452 barrels of Pabst sold nationally were sold in Wisconsin, and 388,678 of the 1,239,334 barrels of Blatz sold nationally were sold in Wisconsin. While these Wisconsin sales are respectable, they do not approach the 71.7% found in the Crown Zellerbach case to constitute the Pacific coast states the predominant and outstanding St. Helens' market. And apparently the evidence in Crown Zellerbach revealed that the Pacific coast states were unique, possessing qualities setting them apart as a separate area.[8] No

8. The court stated in that case:
"Moreover this three-state market is one which, in the language of the Court of Appeals in American Crystal Sugar Co., supra [American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 259 F.2d 524], was subject to common economic forces; it is an area of extraordinarily rapid population growth, with large and growing cities, increasing industrial activities and other growth factors whch set it apart from other areas in the west. The availability of alternative water transportation, while little

comparable evidence in this case establishes that Wisconsin is a unique market for beer or is to be treated differently, by reason of any peculiar characteristics, from any other area in which beer is sold.

In the Bethlehem Steel case, involving a proposed merger between Bethlehem Steel Corporation and The Youngstown Sheet and Tube Company, the court held that the appropriate relevant markets as to four of the products or lines of commerce involved included, but were not limited to the United States as a whole, a submarket thereof—the northeast quadrant of the United States, a submarket of that submarket—Michigan, Ohio, Pennsylvania and New York, a submarket of that latter submarket—Michigan and Ohio, and two submarkets of the latter submarket—(1) Michigan and (2) Ohio. As to seven other lines of commerce, the appropriate relevant market was held to be the United States as a whole. It appears that the court felt that each of the submarkets mentioned was an appreciable segment of the market within which the merging companies were effective competitors primarily because of the large percentage of total industry shipments and of Bethlehem and Youngstown shipments into those submarkets. We consider it significant that the court stated:

"Of course, the national market for a product like steel is not the national market which exists for a product like cigarettes." (168 F. Supp. 576, at page 601.)

recognizing, we believe, that the market for a product like cigarettes was fairly uniform throughout the nation, in which case the nation as a whole would clearly be the relevant market area, while the demand for steel, and iron and steel industry products, was localized or concentrated in various industrialized pockets of the nation. We consider that the beer market resembles the cigarette market more than the steel market in that the record reveals that the use of beer is nation-wide, its sales are not limited primarily to states having any particular industry and no state or area can be said to be predominant in the sales or consumption of beer. The market for beer, unlike the market for steel, is not concentrated. We note also that in Bethlehem Steel, the northeast quadrant of the United States had 83% of national steel consumption, the four-state area of Michigan, Ohio, New York and Pennsylvania received 48.4% of the total industry shipments of common finished steel products, Michigan and Ohio received 31.3% of those shipments, Michigan received 18.2% of those shipments and Ohio received 13.1% of those shipments. In contrast, as noted previously, Wisconsin consumed only between 3.66% and 3.75% of the total beer consumed in the nation during the years 1957 through 1961, a rate of consumption which, in our opinion does not set it aside as an area in which the beer market is concentrated.[9]

We find no merit in the plaintiff's contention that Wisconsin is a relevant market area because the most intense competition between Pabst and Blatz before the acquisition existed in Wisconsin. Pabst and Blatz competed throughout the nation as the plaintiff, in claiming that the continental United States is an appropriate section of the country, admits. In 1957, in competing in Wisconsin, they

availed of, has operated to furnish peculiarly favorable land carrier rates." (296 F.2d 800, at page 817.)

9. In determining the relevant geographic market for the beer industry, we consider sales data, and not production data, to be controlling. As the Supreme Court stated in Philadelphia Bank, quoting Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580, the area of effective competition is the market area in which the seller operates and to which the buyer can practicably turn for supplies. Production figures can, of course, be extremely meaningful where evidence reveals that the production locale affects sales, for example, where transportation costs are so high as to limit sales to an area near the place of production, but no evidence in this case establishes that the location of any brewery affects or limits the area in which the seller operates or to which the buyer turns for supplies.

were competing for only 3.66% of the nation's consumption. As to that 3.66% segment, it is true, they realized considerable success, Pabst selling 340,378 of its total national sales of 2,548,452 barrels of beer in Wisconsin and Blatz selling 388,678 of its total national sales of 1,239,334 in Wisconsin and Pabst selling 11.14% and Blatz 12.81% of all beer sold in Wisconsin. We cannot say, however, from the fact that Pabst and Blatz beers found acceptance in Wisconsin, that the most intense competition between them existed in that state. We have no basis in the record for finding that the degree of success attained by the companies reflected the intensity of the competition between them.[10] And, as we noted before, the percentage of Pabst or Blatz sales in Wisconsin did not approach the percentage of St. Helens' sales in the Pacific coast states in the Crown Zellerbach case, cited by the plaintiff on this point.

Neither do we agree with the plaintiff's contention that Wisconsin is a significant market area "because of its important position in the beer industry as a whole". (Page 7, Government's Brief In Opposition To Defendant's Motion To Dismiss.) In support of this contention, the plaintiff has pointed to production data contained in its exhibits and compared some of the production percentages to consumption percentages in the Bethlehem Steel case. Unquestionably, Wisconsin produced and exported a substantial amount of beer before, at the time of, and since the acquisition of Blatz by Pabst and a sizable number of breweries operated in that state. As we stated previously, however, this production data, while interesting, does not define a relevant geographic market where there is no proof that the place of production in any manner affects sales. Absent such proof, the plantiff's comparison of Wisconsin beer *production* figures with steel *consumption* figures in the Bethelehem Steel case is not apt. As we also stated

previously, the figures presented relative to consumption of beer in Wisconsin are not such as to render Wisconsin a significant market area.

The plaintiff has also argued that Wisconsin (and incidentally every state) is a separate market area in the beer industry because Wisconsin (and every state) is free to regulate that industry and has, in fact, "enacted a complex system of laws which have the effect of making each state a separate and distinct market for competition in the beer industry." (Page 8, Government's Brief In Opposition To Defendant's Motion To Dismiss.) Exhibits introduced in support of this argument establish that states have enacted laws relative to alcoholic content permissible in beer sold within their boundaries, packaging and labelling of beer, etc., which laws must, of course, be respected. The plaintiff admits that the state regulations are common to all breweries and do not make it impossible to sell beer within different states. The fact that beer is sold throughout the United States reveals that the laws of the various states do not deter competitors. The most that can be said is that all competitors are bound by state regulations, must observe them while engaging in competition, and must and do make appropriate adjustments in their procedures in various states to observe them properly. We do not consider it necessary to discuss the evidence as to state regulations introduced by the plaintiff in detail. The plaintiff has admitted that it has no authority for its position that state regulations create separate market areas and we hold that state regulations, equally burdensome on all competitors, which do not prevent or deter competition, do not perforce render every state, including Wisconsin, a separate market area.

While the plaintiff contends that Pabst has recognized Wisconsin to be a unique market by pricing Blatz beer higher in

---

10. The figures introduced by the plaintiff as to the amounts spent by Pabst and Blatz for national and Wisconsin advertising can be given little weight particu-

larly since no evidence as to Blatz expenditures prior to the acquisition were offered.

Wisconsin than elsewhere since the acquisition, during which period more Blatz beer was sold in Wisconsin than in any state except Michigan it has presented proof as to the price of only one type of package and has presented no argument and cited no authority to convince us that this price factor is of any moment in ascertaining the relevant geographic market.

We have also considered the plaintiff's contention that Wisconsin is a relevant geographic market because it is unique in that its per capita consumption of beer is higher than any other state, its consumption of draught beer is high and "it is the center of the small, locally owned breweries remaining in this country." (Page 13, Government's Brief In Opposition To Defendant's Motion To Dismiss.) We are not satisfied that such uniqueness marks Wisconsin as a separate market area. Despite its high per capita consumption of beer, Wisconsin, with its 3.66% of the nation's consumption of beer in 1957, was not an appreciable segment of the market. And we are not at all certain that per capita consumption statistics relative to a product which, by its very nature, cannot be sold to the population at large, but only to adults, are of any value. They may be of aid in determining consumer characteristics but not in defining a market area. The plaintiff has given no reason for considering draught beer separately in determining a market area. The stipulated line of commerce in this case is the beer industry and we cannot single out or place any reliance on statistics regarding draught beer, a division of the product involved, without sufficient reason. As we have stated previously, the location of production facilities has not been shown to affect the market area. In like manner the location of a number of small competitors in Wisconsin has not been shown to make Wisconsin a relevant geographic market.

We hold that the plaintiff has not shown that Wisconsin as a geographic market corresponds to the commercial realities of the beer industry or is economically significant, nor has it shown that Wisconsin is an appreciable segment of the market in the beer industry.

### THE THREE STATE AREA

After the defendant Pabst filed its motion to dismiss and indicated its intention to press that motion, the court directed the parties to file briefs. Because the plaintiff had the burden of proof with respect to the only contested issues, it was directed to file the opening brief, disclosing to the court and to the defendant how it claimed to have satisfied that burden.[11] In its opening brief, its discussion of the facts relative to its position that the three state area is a section of the country within which the effect of the acquisition of Blatz by Pabst should be examined is limited to the following paragraph at Pages 13 and 14:

"In regard to the three-State area of Wisconsin, Illinois, and Michigan, in which the Government has also asked the Court to measure the effects of the merger, it is sufficient to point out that its importance rests on the same factors that make Wisconsin a relevant market. By adding the States of Illinois and Michigan to Wisconsin, the Court may see the effects of the merger in a larger, therefore more 'appreciable' segment of the national market. In 1957 Pabst made 30.5 percent of its sales in the area (JX 55), and ranked seventh with 5.48 percent of the market (JX 91). In that year Blatz made 66.7 per cent of its sales in the area (JX 55), and ranked sixth with 5.84 per cent of the market (JX 91). Forty-two per cent of the combined sales of the two companies was made in the area (JX 55), and together they ranked second with

---

11. Some clarification of the plaintiff's position was necessary since most of the exhibits comprising the plaintiff's case had been introduced into evidence with no explanation whatsoever.

11.32 per cent of the market (JX 91)."

No further discussion on this point is contained in its reply brief, nor did the plaintiff amplify its position on oral argument. It appears therefore that the plaintiff itself relies solely on the revelations in Exhibits 55 and 91 as to percentages of Pabst and Blatz sales in the three state area and Pabst and Blatz shares of the market as satisfying its burden of proof and considers no other facts relevant on this issue.

Exhibit 55 reveals that of the 2,548,-452 barrels of beer sold by Pabst in the continental United States in 1957, 361,-579 barrels were sold in Illinois, 74,928 barrels were sold in Michigan, and 340,-378 barrels were sold in Wisconsin, a total of 776,885 barrels [12] or approximately 30.5% of Pabst's total sales in the continental United States being sold in the three state area. It further reveals that Blatz sold 1,239,334 barrels of beer in 1957, and that 139,707 of those were sold in Illinois, 298,672 in Michigan and 388,678 in Wisconsin, a total of 827,057 barrels,[13] or approximately 66.-7% of Blatz's sales in the continental United States, being made in the three state area.

Exhibits 91 and 92 reveal that in 1957, 14,230,609 barrels of beer were sold in the three state area by a total of 104 breweries. Blatz was the sixth largest seller with 5.84% of the market and Pabst ranked seventh with 5.48% of the market.

■ The plaintiff apparently contends that the bulk of Pabst and Blatz sales occurred in the three state area with the result that the most intense competition between them was in that area, therefore that is a relevant market area. Unquestionably, both Pabst and Blatz were successful in the three state area. However, we find no precedent for permitting the plaintiff to select an area in which the two companies, which competed nationally, realized success and, solely because of that success, designate the area a relevant geographic market. In our opinion, in this case where the companies involved concededly competed nationally, the plaintiff, in order to satisfy its burden of proving that the three state area is a relevant geographic market, must demonstrate something beyond the fact that isolation of that area from the national market would result in percentages favorable to its position. It must first demonstrate that under the "commercial realities" of the beer industry, Illinois, Michigan and Wisconsin is a relevant market area. No such proof is in the record.

THE PLAINTIFF HAS NOT SATISFIED ITS BURDEN OF PROVING THAT THE EFFECT OF THE ACQUISITION OF BLATZ BY PABST MAY BE SUBSTANTIALLY TO LESSEN COMPETITION OR TO TEND TO CREATE A MONOPOLY IN THE BEER INDUSTRY IN THE CONTINENTAL UNITED STATES, THE ONLY RELEVANT GEOGRAPHIC MARKET.

Having held that neither Wisconsin nor the three state area of Wisconsin, Illinois and Michigan is a relevant geographic market, we must now determine whether in the continental United States, the stipulated relevant market area, the effect in the beer industry of the acquisition of Blatz by Pabst may be that prohibited by § 7 of the Clayton Act, which does not prohibit all such acquisitions but only those the effect of which "may be substantially to lessen competition, or to tend to create a monopoly."

■■ The plaintiff has the burden of proving that there is a reasonable probability that the acquisition may have the proscribed effect. In order for the plaintiff to satisfy its burden it must present either evidence sufficient to support a finding that the acquisition, a fait ac-

---

12. Exhibit 91 shows sales of 779,234 barrels by Pabst in the three state area in 1957.

13. Exhibit 91 shows sales of 831,527 barrels by Blatz in the three state area in 1957.

compli when this action commenced, already had that effect or evidence sufficient to supply a basis for a finding and prediction that a reasonably probable consequence of the acquisition may be substantially to lessen competition or to tend to create a monopoly in the future. As the Supreme Court noted in the Brown Shoe case:

> "the very wording of § 7 requires a prognosis of the probable *future* effect of the merger" (370 U.S. 294, at page 332, 82 S.Ct. 1502, at page 1528)

> "It is the probable effect of the merger upon the future as well as the present which the Clayton Act commands the courts and the Commission to examine." (370 U.S. 294, at page 333, 82 S.Ct. 1502, at page 1528)

In our opinion the evidence introduced by the plaintiff does not satisfy its burden.

■ The plaintiff appears to contend that it has demonstrated that the acquisition may substantially lessen competition or tend to create a monopoly in the continental United States by (1) statistical evidence as to the market share controlled by Pabst as a result of the acquisition, (2) statistical evidence showing a trend toward concentration in the brewing industry, and, (3) evidence as to the "vertical effects" of the acquisition on distributors of beer and on maltsters. We shall discuss first the evidence referred to in Points 1 and 2, reserving until later consideration of evidence relating to distributors and maltsters.

In 1934, the first full year of beer production after the repeal of prohibition, there were 714 breweries in the United States. In 1935, the number of breweries increased to a peak of 750 and it thereafter declined so that in 1957 there were 264 breweries and by 1961 the number of breweries in the United States was 229. Thus, during the period from 1935

through 1961 there was a 69.47% decline in the number of breweries operating in the United States. During that same period in the continental United States there was a fairly steady increase in taxpaid withdrawals of beer from 39,654,720 barrels in 1934 to 84,288,580 barrels in 1957, to 88,976,417 barrels in 1961. Consumption of beer increased fairly steadily from 35,862,145 barrels in 1934 to 83,779,609 barrels in 1957, to 88,485,795 barrels in 1961, and production of beer increased fairly steadily from 47,735,901 barrels in 1935 to 89,382,923 barrels in 1957, to 94,972,948 barrels in 1961.

In its exhibits 32 through 46, the plaintiff has listed the breweries selling beer in the United States for each of the years 1957 through 1961,[14] and the ranking of each brewery and its percentage of sales for those years. In 1957, sales of beer were made in the United States by 206 breweries. Twenty-seven breweries made 1% or more of the sales, three, Anheuser-Busch, Schlitz and Falstaff made over 5% of sales and two, Ballantine and Hamm, sold more than 4%, but less than 5%. Pabst ranked tenth in sales with 3.02% and Blatz ranked eighteenth with 1.47%, a combined total of 4.49%. The top ten breweries in that year had 45.06% of sales and the top twenty-five had 68.99% of sales. In 1958, 191 breweries sold beer in the United States. Twenty-six breweries made 1% or more of the sales, three, Anheuser-Busch, Schlitz and Falstaff made over 5% of sales and three, Ballantine, Carling and Hamm sold more than 4% but less than 5%. Pabst ranked eleventh in sales with 2.67% and Blatz ranked thirteenth with 2.04%, a combined total of 4.71%. The top ten breweries in that year had 46.06% of sales and the top twenty-five had 70.71% of sales. In 1959, 177 breweries sold beer in the United States. Twenty-six breweries made 1% or more of the sales, three, Anheuser-

14. The number of breweries listed differs from the number shown in Exhibits 212 and 213. No explanation of this variance has been offered. Probably Exhibits 212 and 213 refer to brewing premises while Exhibits 32 through 46 refer to brewing companies.

Busch, Schlitz and Falstaff, made over 5% and four, Carling, Ballantine, Pabst (with the addition of Blatz) and Hamm, sold more than 4% but less than 5%. Pabst (with the addition of Blatz) and Hamm, sold more than 4% but less than 5%. Pabst, with its acquisition of Baltz, ranked sixth with 4.79%, slightly more than the combined total of the two companies the preceding year. The top ten breweries had 49.51% of sales and the top twenty-five had 73.44% of sales. In 1960, 171 breweries sold beer in the United States. Twenty-seven breweries made 1% or more of the sales, four, Anheuser-Busch, Schlitz, Falstaff and Carling, made over 5% of sales, and three, Ballantine, Pabst (with the addition of Blatz), and Hamm sold more than 4% but less and 5%. Pabst combined with Blatz ranked sixth with 4.98%. The top ten breweries had 50.75% of sales and the top twenty-five had 74.83% of sales. In 1961, 162 breweries sold beer in the United States. Twenty-five breweries made 1% or more of the sales, six, Anheuser-Busch, Schlitz, Pabst (with the addition of Blatz), Falstaff, Carling and Ballantine, made over 5% of sales and one, Hamm, sold more than 4% but less than 5%. Pabst combined with Blatz ranked third with 5.83%. This increase in Pabst's rank and market share between 1960 and 1961, the only sizable increase over the combined market share of Pabst and independent Blatz in 1957, has not been connected by the plaintiff in any way with its acquisition of Blatz in 1958. The top ten breweries in 1961 had 52.60% of sales and the top twenty-five had 76.-96% of sales.

In 1948, the top ten brewing companies in the United States sold 32.68% of the beer sold in the United States and the top twenty-five sold 49.2%.

### MARKET SHARES.

It is true, as argued by the plaintiff, that in the Brown Shoe case, in discussing the horizontal aspects of the merger involved on the retailing level, the Supreme Court recognized the significance of market shares as a factor in predicting the probable effect of a merger on competition stating:

> "The market share which companies may control by merging is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market." (370 U.S. 294, at page 343, 82 S.Ct. 1502, at page 1534)

However, it also stated in discussing the vertical aspects of the merger that:

> " * * * an important consideration in determining whether the effect of a vertical arrangement 'may be substantially to lessen competition, or to tend to create a monopoly' is the size of the share of the market foreclosed. *However, this factor will seldom be determinative.* If the share of the market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of course, have been violated; but the arrangement will also have run afoul of the Sherman Act. And the legislative history of § 7 indicates clearly that the tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act. On the other hand, foreclosure of a *de minimis* share of the market will not tend 'substantially to lessen competition.'

> "*Between these extremes, in cases such as the one before us, in which the foreclosure is neither of monopoly nor de minimis proportions, the percentage of the market foreclosed by the vertical arrangement cannot itself be decisive. In such cases, it becomes necessary to undertake an examination of various economic and historical factors in order to determine whether the arrangement under review is of the type Congress sought to proscribe.*" (Emphasis added.) (370 U.S. 294, at pages 328–329, 82 S.Ct. 1502, at pages 1525–1526)

With respect to the horizontal aspects of the merger on the retailing level, the Supreme Court considered many factors in addition to market shares.

In the Philadelphia Bank case, the Supreme Court held that the percentage of the market controlled as a result of a merger may be of such size as to raise an inference that the merger may substantially lessen competition, that "with respect to mergers whose size makes them inherently suspect" (374 U.S. 321, at page 363, 83 S.Ct. 1715, at page 1741) proof of market shares alone on the part of the Government would be sufficient to shift to the opposing parties the burden of proving that the merger is not likely to have anticompetitive effects and that proof of control of 30% of the market as a result of a merger was sufficient to raise an inference that the merger would substantially lessen competition.

The plaintiff apparently realizes that the share of the market controlled by Pabst in the continental United States, which we have held to be the only relevant geographic market, as a result of the acquisition of Blatz is not itself of such dimensions as to raise an inference that the effect of the acquisition may be substantially to lessen competition or tend to create a monopoly. In presenting its market share argument in its brief, it concentrates on Wisconsin and to a minor extent on the three state area, and, when it discusses the continental United States, ties this argument in with its second point—that the brewing industry is tending toward concentration, and its third point—the vertical effects of the acquisition. Thus, on Page 18 of its brief in opposition to the motion to dismiss, it argues:

"In the United States market, Pabst made a phenomenal rise from eleventh place in total sales to third place in three years. Pabst rose from 2,-254,001 barrels to 4,194,321 barrels

in 1959 and continued upward to 5,-192,062 barrels in 1961 and thus more than doubled its sales in that short period of time (JX 35–JX 44, JX 47–JX 59, GX 209)

Just consider what was happening in this market: The eleventh largest United States brewery bought the eighteenth largest and in a space of three years became the third largest in sales; from 2.67 per cent of that market it almost doubled its market share to become 4.98 per cent. The effect in these areas is sufficient to establish a probable lessening of competition under Section 7, *especially when considered in conjunction with vertical effects, and the general context of the industry. In an industry containing a number of vulnerable small businesses, which were subject to an accelerating trend toward competition, [sic]* the Supreme Court, in the Brown Shoe case, found illegal a merger which would have given Brown Shoe Co. control of only 4½ per cent of national shoe production,[15] and 7.2 per cent of the nation's shoe stores." (Emphasis added.)

The "phenomenal rise" to which the plaintiff refers was actually an increase in Pabst's market share from 3.02% in 1957 and 2.67% in 1958 to 4.79% in 1959, an increase which can be almost completely accounted for by the addition of Blatz's market share to that of Pabst. This resultant percentage of the United States market is not in and of itself an "effect * * * sufficient to establish a probable lessening of competition under Section 7." In our opinion, proof that Pabst had a 4.79% share of the market after the acquisition in 1959, which percentage had grown to 5.83% in 1961, is not sufficient to establish that the acquisition is inherently likely to lessen competition under the rule of the Philadelphia Bank case, nor that Pabst and Blatz

---

15. This reference is grossly misleading since in Brown Shoe it was held that the merger of Brown's and Kinney's manufacturing facilities with 4% and 0.5% of the

market, was economically too insignificant to come within the prohibitions of the Clayton Act.

were major competitive factors comparable to the consolidating banks in the Lexington Bank case. This is not a case in which the plaintiff can shift to Pabst the burden of proving the absence of probable anticompetitive effects in the continental United States by proof of market shares alone. We must therefore determine whether the additional documents offered by the plaintiff relative to the probable effect of the acquisition, that is, documents which the plaintiff believes prove a trend toward concentration in the brewing industry and a reasonable probability of anticompetitive vertical effects, present evidence sufficient to put the defendant Pabst to its proof.

## TREND TOWARD CONCENTRATION.

The only proof in the record relating to the plaintiff's position that the brewing industry has experienced a trend toward concentration is statistical evidence establishing that (1) the number of breweries in the United States has decreased, (2) production, consumption and taxpaid withdrawals of beer have increased, and (3) the percentage of the market shared by the top ten and top twenty-five breweries has increased. This statistical showing absolutely fails to establish a trend toward concentration in the beer industry. In the absence of any showing to the contrary, it must be concluded that all three factors are the result of operation of normal competitive forces, and we do not understand the plaintiff to urge that in enacting § 7 Congress wished to interfere with those forces.

Our interpretation of the authorities cited by the plaintiff, the Bethlehem Steel case, the Brown Shoe case, and the Philadelphia Bank case, is not that Congress, in enacting § 7, was attempting to stifle or immobilize successful competitors or to secure for those who did not wish to compete or for failing competitors—those who could not compete because of inferior products, management, etc.—a place in the market. Rather, it wished to prevent overzealous competitors from enhancing their positions to the detriment of competition by mergers or acquisitions. The type of concentration § 7 was designed to avoid was concentration resulting from mergers and acquisitions, not increases in market shares resulting from superiority of product or services. Judge Weinfeld stated in the Bethlehem Steel case in discussing Congressional intent relative to concentration that the objective of Congress was:

"to limit future increases in the level of economic concentration *resulting from corporate mergers and acquisitions.*" (Emphasis added.) 168 F. Supp. 576, at page 583.

And at Page 604 of that case, Judge Weinfeld said:

"A major purpose of section 7 is to ward off the anticompetitive effects of increases 'in the level of economic concentration *resulting from corporate mergers and acquisitions*'. Both the Senate and House Committee Reports emphasized the deep concern of the Congress with the continued trend towards concentration of economic power *through mergers and acquisitions.*" (Emphasis added.)

In Brown Shoe, the Supreme Court, discussing the trend toward concentration in the shoe industry, spoke not of a mere lessening in the number of competitors but of a history of acquisition by manufacturers of retail outlets, of combinations and of mergers. In a footnote, the Court said:

"A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available con-

sumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry." (370 U.S. 294, at page 345, 82 S.Ct. 1502, at page 1534).

In Philadelphia Bank too, the Supreme Court, speaking of a trend toward concentration in commercial banking, referred to a record showing the disappearance during one decade of 1601 independent banks, 1503 of which disappeared as the result of mergers, and to a prior history of mergers in the Philadelphia area.

█ The plaintiff herein, upon which rests the burden of proof, however, has shown no "trend toward concentration" in the beer industry, as that term has been used in the authorities upon which it relies. So far as the record discloses, not a single merger or acquisition in the beer industry preceded the acquisition of Blatz by Pabst and the decrease in the number of breweries resulted from the play of natural economic forces. No contrary showing having been made, we must hold that no trend toward concentration has existed in the beer industry.[16]

## VERTICAL EFFECTS OF THE ACQUISITION ON MALTSTERS.

In Paragraph 17 of its complaint and in a more definite statement with respect thereto, the plaintiff alleges that malt, a primary ingredient in the brewing process, is produced by Pabst for use in its own breweries and in the manufacture of other products, that prior to its acquisition by Pabst, Blatz purchased its malt requirements from outside sources, that prior to the acquisition Pabst's malt capacity exceeded its own needs, that

after the acquisition Blatz brand beer contained only Pabst produced malt and no malt purchased from outside sources and that the acquisition harmed independent malt suppliers by cutting off Blatz as a market and harmed independent breweries by depriving them of a potential supply of Pabst produced malt. In its answer Pabst admits that malt is a primary ingredient in the brewing process and is produced by Pabst for use in its own breweries and in the manufacture of other products, and that prior to the acquisition Blatz purchased its malt from suppliers. The plaintiff was put to its proof on the remaining allegations.

The plaintiff's proof consisted of Exhibits 116 and 117, answers to interrogatories which had been submitted by the plaintiff to Pabst. Exhibit 117 establishes that in 1957 Blatz purchased a total of $2,105,845.05 worth of malt from seven suppliers and in the first seven months of 1958 its malt purchases from eight suppliers amounted to $1,609,037.43. Exhibit 116 establishes that in 1957, Pabst purchased $515,066.78 worth of malt from outside suppliers, in 1958 it purchased $2,277,945.02 worth of malt from outside suppliers and in 1959 it purchased $1,768,779.17 worth of malt from outside suppliers. Some of the malt purchased in 1958 was purchased at the Blatz premises, but none of the malt purchased in 1959 was purchased at the Blatz premises.[17]

Nothing in Exhibits 116 or 117 tends to prove the plaintiff's allegations that Pabst's malt capacity prior to the acquisition exceeded its own needs, or that since the acquisition Blatz brand beer has contained only Pabst produced malt. Neither is there any proof that the acquisition harmed independent breweries by depriving them of a potential source of supply for malt from Pabst's malt

---

16. Of course the acquisition in question could conceivably violate § 7 even if it were the first in the beer industry. However, since the plaintiff has proved no trend toward concentration we cannot, in determining the probable effect of the acquisition, view it against a backdrop of concentration as the plaintiff urges.

17. As stated previously, the Blatz premises went on a shut-down status in 1959. Brewing at that plant ceased prior to February 20, 1959.

producing facilities.[18] The plaintiff appears to recognize these deficiencies in its brief since it directs no argument toward those allegations.

It is true as the plaintiff contends that no malt was purchased from independent maltsters for the Blatz plant in 1959. However, Exhibit 116 reveals that Pabst purchases of malt from independent maltsters for its four breweries in 1959 exceeded by over $1,250,000 its 1957 purchases. Since Blatz brand beer was being brewed in Pabst plants in 1959 it is a fair assumption that Pabst had to increase its purchases of malt to brew Blatz brand beer.

The plaintiff states in its brief that it has clearly demonstrated that the maltsters selling malt to Blatz in the eighteen months prior to the acquisition lost the entire market represented by the Milwaukee-Blatz Brewery and that this loss of over two million dollars of business is a serious matter for them. This argument is a distortion since it ignores the increase in Pabst malt purchases after the acquisition. We do not consider it of any importance that some of the Pabst suppliers of malt were different from those who formerly supplied Blatz and that some of the former Blatz suppliers sold no malt to Pabst in 1959. Pabst purchased from independent suppliers and as far as the record reveals all were free to compete for its business. Just as Blatz prior to the acquisition could have changed suppliers if it desired, so also Pabst was not bound by any dictates of the Clayton Act to purchase only from former suppliers to Blatz.

 The record with respect to maltsters reveals only that independent maltsters sold less malt for brewing Pabst and Blatz brand beers in 1959 than in 1957. On this meager record, unsupported by any testimony, we cannot hold that the impact on independent maltsters of the acquisition was significant. And the facts herein are so dissimilar from those in the Bethlehem Steel case relied upon by the plaintiff that no discussion thereof is warranted. We need only say that here the acquired company sold no ingredients (malt-rope wire) to third parties and bought back no finished product (beer-wire rope) from third parties.

We have also considered the rather inconsistent arguments advanced by the plaintiff that (1) suppliers of malt have been adversely affected by the acquisition because Pabst and Blatz, which used to compete in their purchases, no longer compete,[19] and (2) Blatz is now part of an integrated company with a competitive advantage over non-integrated breweries.[20] These arguments are contained in two unenlightening paragraphs at Pages 25 and 26 of the plaintiff's brief in opposition to the motion to dismiss.

As stated before, the only evidence in the record relative to malt is Exhibits 116 and 117, neither of which in any way defines the malt industry or the nature of competition therein or reveals that there is benefit to a brewer in being integrated as to its supply of malt even if integration be shown. These arguments are based on nothing but surmise, and manifest no reasonable probability of anticompetitive effects in either the beer industry—the only line of commerce involved herein—or the malt industry.

### VERTICAL EFFECTS OF THE ACQUISITION ON DISTRIBUTORS.

 It is the position of the plaintiff that immediately after its acquisition of Blatz, Pabst established a policy of consolidating Pabst and Blatz distributors and that cancellation of a distributor and the throwing of Pabst and Blatz brands into a consolidated distributorship less-

---

18. There is no indication that Pabst ever sold malt or had the potential to sell it or, if it was a potential source of supply for independent breweries, that the acquisition of Blatz interfered with that potential.

19. This argument indicates that the plaintiff believes that Pabst's competitive position in purchasing malt has been enhanced.

20. This argument indicates that the plaintiff believes no malt need be purchased.

ens competition in the sale of beer by depriving the cancelled distributor of his source of supply and by lessening the number of competing distributors, thereby lessening competition among distributors.[21] The plaintiff further argues that a potential lessening of competition between distributors occurred in areas where only one brand was distributed prior to the acquisition and where after the acquisition the existing distributor distributed both brands because, absent the acquisition, another distributorship might have been established.

We know from the record that distributors are important since approximately 80% of Pabst beer was sold through them prior to the acquisition and between 75% and 80% of Blatz beer was sold through them both before and after the acquisition.[22] We also know from the record that "the vast majority" (Page 100 of Transcript) of distributors handle more than one brand of beer. Beyond that we know nothing of the nature and function of distributorships in general— their relationship to breweries they represent, their contract rights, if any, their dependence or lack of dependence upon a particular brand, the nature of competition, if any, among them, the number of distributorships and the number of Pabst and/or Blatz distributorships in existence, etc. With these glaring voids in the proof, we must hold that the plaintiff has not shown that any probable effect of the acquisition on distributors may be substantially to lessen competition or to tend to create a monopoly in the beer industry.

The facts in the Bethlehem Steel case, from which the plaintiff has quoted the following statement as authority for its position:

"A horizontal merger can affect competition in at least two ways. It can have an impact not only on the competitors of the merged companies but also on the buyers who must rely upon the merged companies and their competitors as sources of supply." (168 F.Supp. 576, at page 588)

and the facts in Crown Zellerbach, which it cited on oral argument, do not resemble those in the case at bar, since beer distributors handle more than one brand of beer and have numerous alternate sources of supply.

## CONCLUSION.

In presenting its case, the plaintiff has deliberately chosen to rely on documentary, primarily statistical, evidence and, to a very minor extent, on excerpts from depositions. It has failed completely to present any information, other than statistics, concerning the structure, history and probable future of the market which would, in the words of Brown Shoe "provide the appropriate setting for judging the probable anticompetitive effect of the merger." (370 U.S. 294, at page 322, 82 S.Ct. 1502, at page 1522). It has offered no testimony from either economists or experts in the beer industry in support of its position as to the relevant geographic market. It has failed to produce a single brewer, maltster, or distributor, or any person knowledgeable in this industry, in support of its position that the effect of Pabst's acquisition of Blatz may be that proscribed by § 7. Under these circumstances, and for the reasons heretofore set forth, we must hold that the plaintiff has shown no right to relief. The motion of the defendant Pabst for dismissal pursuant to Rule 41(b) of the Federal Rules of Civil Procedure must therefore be granted.

Counsel for the defendant, Pabst, will prepare findings of fact and conclusions of law pursuant to this Opinion, and submit them to counsel for the plaintiff for approval as to form.

---

21. The documentary evidence established that eight distributorships were lost by consolidation after the acquisition.

22. The record does not reveal how the remaining beer was sold.