## UNITED STATES *v.* FIRST NATIONAL BANK & TRUST CO. OF LEXINGTON ET AL.

No. 36.   Argued March 4–5, 1964.—Decided April 6, 1964.

*Daniel M. Friedman* argued the cause for the United States. On the brief were *Solicitor General Cox, Assistant Attorney General Orrick, Robert B. Hummel, Larry L. Williams, Melvin Spaeth* and *Richard J. Wertheimer.*

*Robert M. Odear* argued the cause for appellees. With him on the brief were *Gladney Harville, Rufus Lisle* and *Clinton M. Harbison.*

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BLACK.

This is a civil suit in which the United States charges that the consolidation of First National Bank and Trust Co. of Lexington, Kentucky (First National), and Security Trust Co. of Lexington (Security Trust), to form First Security National Bank and Trust Co. (First Security), constitutes a combination in restraint of trade and commerce in violation of § 1 of the Sherman Act and a combination and an attempt to monopolize trade and commerce in violation of § 2 of that Act.[1]  26 Stat. 209 as amended, 15 U. S. C. §§ 1, 2.

The plan of consolidation was submitted to the Comptroller of the Currency and he, pursuant to the provision of the Bank Merger Act of 1960, 74 Stat. 129, 12 U. S. C. (Supp. IV) § 1828 (c), requested and received reports of the probable competitive effects of the proposed consoli-

---

[1] Sections 1 and 2 of the Sherman Act provide in pertinent part:

"SEC. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. . . .

"SEC. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor. . . ."

dation from the Attorney General, the Federal Deposit Insurance Corp., and the Board of Governors of the Federal Reserve System. Each report concluded that the consolidation would adversely affect competition among commercial banks in Fayette County. Nevertheless, the Comptroller of the Currency approved the consolidation on February 27, 1961; it was effected March 1, and this Sherman Act suit was filed the same day. The District Court, while agreeing that the Comptroller of the Currency's approval of the consolidation did not render it immune from challenge under the Sherman Act,[2] held that no violation of that Act had been shown. 208 F. Supp. 457. The case is here on direct appeal. 15 U. S. C. § 29. We noted probable jurisdiction. 374 U. S. 824.

We agree with the District Court that commercial banking is one relevant market [3] for determining the § 1 issue in the case. In Fayette County commercial banks are the only financial institutions authorized to receive demand deposits and to offer checking accounts. They are also the only financial institutions in the county that accept time deposits from partnerships and corporations and that make single-payment loans to individuals [4] and commercial and industrial loans to businesses. Moreover, commercial banks offer a wider variety of financial services than the other financial institutions, e. g., deposit

---

[2] That issue was put to rest by *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 350–355.

[3] In view of our disposition of the case we find it unnecessary to determine whether trust department services alone are another relevant market.

[4] Small loan companies make personal loans of $800 or less at interest rates higher than those charged by commercial banks. Since commercial banks carry a large volume of demand deposits, their real estate loans are generally of a shorter duration than those offered by savings and loan associations or insurance companies.

boxes, Christmas Clubs, correspondent bank facilities, collection services, and trust department services.

We also agree with the District Court that the consolidation should be judged in light of its effect on competition in Fayette County.[5] The record establishes that here, as in *United States* v. *Philadelphia National Bank,* 374 U. S. 321, the "factor of inconvenience" does indeed localize banking competition "as effectively as high transportation costs in other industries." 374 U. S., at 358. Practically all of the business of the banks in Lexington originates in Fayette County. Only 4.8% of First National's demand deposit accounts and 4.5% of Security Trust's were held by depositors who did not maintain offices in Lexington. In dollar volume the percentage was 2.8 for each bank. Apart from large national companies, businesses in the area are restricted to the Fayette County banks for their working capital loans; and commercial banks outside Lexington do a negligible amount of business in the county. There is also a negligible amount of competition from corporate fiduciaries outside Fayette County.

We turn then to the facts relevant to the alleged restraint of trade under the Sherman Act.

Prior to the consolidation the relative size of First National as compared to its five competitors was as follows:

|  | Assets | Deposits | Loans |
|---|---|---|---|
| First National | 39.83% | 40.06% | 40.22% |
| Citizens Union | 17.06 | 16.78 | 16.41 |
| Bank of Commerce | 12.99 | 13.32 | 14.46 |
| Security Trust | 12.87 | 11.88 | 13.98 |
| Central Bank | 9.14 | 9.66 | 8.85 |
| Second National | 8.10 | 8.30 | 6.09 |

---

[5] The Federal Deposit Insurance Corp. and the Federal Reserve Board used Fayette County as the geographical market, the latter saying that "since there are no concentrations of population in other

The bank established by the consolidation was. larger than all the remaining banks combined:

|  | Assets | Deposits | Loans |
|---|---|---|---|
| First Security | 52.70% | 51.95% | 54.20% |
| Citizens Union | 17.06 | 16.78 | 16.41 |
| Bank of Commerce | 12.99 | 13.32 | 14.46 |
| Central Bank | 9.14 | 9.66 | 8.85 |
| Second National | 8.10 | 8.30 | 6.09 |

Prior to the consolidation, First National and Security Trust had been close competitors in the trust department business. Between them they held 94.82% of all trust assets, 92.20% of all trust department earnings, and 79.62% of all trust accounts:

|  | Trust Assets | Trust Dept. Earnings | Number of Trust Accounts |
|---|---|---|---|
| Security Trust | 50.55% | 46.91% | 54.31% |
| First National | 44.27 | 45.29 | 25.31 |
| Citizens Union | 3.41 | 4.21 | 16.01 |
| Second National | 1.33 | .63 | 2.12 |
| Bank of Commerce | .44 | 2.96 | 2.26 |

There was here no "predatory" purpose. But we think it clear that significant competition will be eliminated by the consolidation. There is testimony in the record from three of the four remaining banks that the consolidation will seriously affect their ability to compete effectively over the years; that the "image" of "bigness" is a powerful attraction to customers, an advantage that increases progressively with disparity in size; and that the multiplicity of extra services in the trust field which the new company could offer tends to foreclose competition there.

We think it clear that the elimination of significant competition between First National and Security Trust constitutes an unreasonable restraint of trade in viola-

---

counties close enough to create competition with other banks, the competitive effects of the proposed consolidation would be confined to the Lexington banks."

tion of § 1 of the Sherman Act. The case, we think, is governed by *Northern Securities Co.* v. *United States,* 193 U. S. 197, and its progeny. The Northern Pacific and the Great Northern operated parallel lines west of Chicago. A holding company acquired the controlling stock in each company. A violation of § 1 was adjudged without reference to or a determination of the extent to which the traffic of the combined roads was still subject to some competition. It was enough that the two roads competed, that their competition was not insubstantial, and that the combination put an end to it. *Id.,* at 326–328.

*United States* v. *Union Pacific R. Co.,* 226 U. S. 61, was in the same tradition. Acquisition by Union Pacific of a controlling stock interest in Southern Pacific was held to violate § 1 of the Sherman Act. As in the *Northern Securities* case the Court held the combination illegal because of the elimination of the *inter se* competition between the merging companies, without reference to the strength or weakness of whatever competition remained. The Court said:

> "It is urged that this competitive traffic was infinitesimal when compared with the gross amount of the business transacted by both roads, and so small as only to amount to that incidental restraint of trade which ought not to be held to be within the law; but we think the testimony amply shows that, while these roads did a great deal of business for which they did not compete and that the competitive business was a comparatively small part of the sum total of all traffic, state and interstate, carried over them, nevertheless such competing traffic was large in volume, amounting to many millions of dollars. Before the transfer of the stock this traffic was the subject of active competition between these systems, but by reason of the power arising from such transfer it has since been placed under a common control.

It was by no means a negligible part, but a large and valuable part, of interstate commerce which was thus directly affected." *Id.*, at 88–89.

*United States* v. *Reading Co.*, 253 U. S. 26, is the third of the series. There a holding company brought under common control two competing interstate carriers and two competing coal companies. That was held "without more" to be a violation of §§ 1 and 2 of the Sherman Act. *Id.*, at 59.

The fourth of the series is *United States* v. *Southern Pacific Co.*, 259 U. S. 214, in which the acquisition by Southern Pacific of stock of Central Pacific—a connecting link for transcontinental shipments by a competitor of Southern Pacific—was held to violate the Sherman Act. In reference to the earlier cases [6] the Court said:

> "These cases, collectively, establish that one system of railroad transportation cannot acquire another, nor a substantial and vital part thereof, when the effect of such acquisition is to suppress or materially reduce the free and normal flow of competition in the channels of interstate trade." *Id.*, at 230–231.

We need not go so far here as we went in *United States* v. *Yellow Cab Co.*, 332 U. S. 218, 225, where we said:

> ". . . the amount of interstate trade thus affected by the conspiracy is immaterial in determining whether a violation of the Sherman Act has been charged in the complaint. Section 1 of the Act outlaws unreasonable restraints on interstate commerce, regardless of the amount of the commerce affected."

The four railroad cases at least stand for the proposition that where merging companies are major competitive

---

[6] Two of which had been decided after *Standard Oil Co.* v. *United States*, 221 U. S. 1, which announced "the rule of reason."

factors in a relevant market, the elimination of significant competition between them, by merger or consolidation, itself constitutes a violation of § 1 of the Sherman Act. That standard was met in the present case in view of the fact that the two banks in question had such a large share of the relevant market.

It is said that *United States* v. *Columbia Steel Co.,* 334 U. S. 495, is counter to this view. There the United States Steel Corp. acquired the assets of Consolidated Steel Corp. Both made fabricated structural steel products, the former selling on a nation-wide basis, the latter in 11 States. The conclusion that the acquisition was lawful was reached after the Court observed, *inter alia,* that because of rate structures and the location of United States Steel's fabricating subsidiaries, the latter were unable to compete effectively in Consolidated's market. *Id.,* at 511–518, 529–530. The *Columbia Steel* case must be confined to its special facts. The Court said:

> "In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market. We do not undertake to prescribe any set of percentage figures by which to measure the reasonableness of a corporation's enlargement of its activities by the purchase of the assets of a competitor. The relative effect of percentage command of a market varies with the setting in which that factor is placed." *Id.,* at 527–528.

In the present case all those factors clearly point the other way, as we have seen. Where, as here, the

merging companies are major competitive factors in a relevant market, the elimination of significant competition between them constitutes a violation of § 1 of the Sherman Act. In view of our conclusion under § 1 of the Sherman Act, we do not reach the questions posed under § 2.

*Reversed.*

MR. JUSTICE BRENNAN and MR. JUSTICE WHITE agree with the Court that the elimination of competition between the two banks in the circumstances here presented was a violation of § 1 of the Sherman Act. They would rest the reversal, however, solely on the conclusion that the factors relied on in *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 527–528, quoted by the Court, as applied to the facts of this case, clearly compel the reversal.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

But for the Court's return to a discarded theory of antitrust law, this case would have little future importance. The decision last Term in *United States* v. *Philadelphia National Bank,* 374 U. S. 321, that § 7 of the Clayton Act, 15 U. S. C. § 18, is applicable to bank mergers surely marks the end of cases like this one, in which the Government relies solely on §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1, 2. Since, however, this case, doomed to be a novelty in the reports, has become the vehicle for turning the clock back to antitrust law of days long past, I am constrained to do more than merely register my dissent.

I.

Stripped of embellishments, the Court's opinion amounts to an invocation of formulas of antitrust numerology and a presumption that in the antitrust field good

things come usually, if not always, in small packages.[1] The "facts relevant to the alleged restraint of trade under the Sherman Act," *ante,* p. 668, on which the Court relies, are: (1) the size relative to their competitors of First National and Security Trust before the consolidation and of First Security after the consolidation; (2) the competitive position before the consolidation of First National and Security Trust in the more limited area of trust business;[2] and (3) "testimony in the record from three of the four remaining banks that the consolidation will seriously affect their ability to compete effectively over the years . . . ," *ante,* p. 669.

The testimony to which the Court adverts was provided by competitors of First Security and was characterized by the district judge who heard it as seemingly "based merely upon surmise and . . . lacking in factual support." 208 F. Supp. 457, 460. Since the Court suggests no reason for regarding this evidentiary finding of the trial court as "clearly erroneous," it must be accepted here, *e. g., United States* v. *Yellow Cab Co.,* 338 U. S. 338, 341–342, leaving as the factual basis for the Court's decision only the statistics unquestionably showing that First National and Security Trust were big and First Security is bigger. The embellishment which adorns these statistics is the proposition that "where merging companies are major competitive factors in a relevant market, the elimination of significant competition between them, by

---

[1] Compare the dissenting opinion in *United States* v. *Columbia Steel Co.,* 334 U. S. 495, 534.

[2] The reason for singling out this aspect of the banks' activities is unclear, since the Court does not determine even whether trust department services should be regarded as a relevant market. See *ante,* p. 667, note 3. In view of the majority's disposition of the case, I do not set out here my reasons for believing that the District Court's determination that the consolidation in question does not violate § 2 of the Sherman Act (monopoly) should be affirmed.

merger or consolidation, itself constitutes a violation of § 1 of the Sherman Act," *ante,* pp. 671–672.

The sole support for this proposition, which is defended by no independent reasoning whatever, is the four "railroad cases," a reiteration of which forms the bulk of the Court's opinion.[3] It is questionable whether those cases, three of which involved the combination of massive transportation systems [4] and the fourth a combination of "two great competing interstate carriers and . . . two great competing coal companies extensively engaged in interstate commerce" [5] have any relevance to the present factual situation. That question, however, need not be explored.

In *United States* v. *Columbia Steel Co.,* 334 U. S. 495, these same cases were cited by the Government for the same proposition urged here: that "control by one competitor over another violates the Sherman Act . . . ," *id.,* at 531. The Court relegated the cases to a footnote and stated that it would not "examine those cases to determine whether we would now approve either their language or their holdings." *Ibid.* The facts of the "railroad cases" were found to be "so dissimilar from that presented" that they could "furnish little guidance" in deciding the later case. *Ibid.* Beyond this explicit rejection of these cases as a basis for decision is their further rejection clearly implicit in the portion of the *Columbia Steel* opinion which the Court quotes, *ante,* p. 672.

> "In determining what constitutes unreasonable restraint, we do not think the dollar volume is in itself of compelling significance; we look rather to the

[3] *United States* v. *Yellow Cab Co.,* 332 U. S. 218, cited by the Court, *ante,* p. 671, is wholly irrelevant.

[4] *Northern Securities Co.* v. *United States,* 193 U. S. 197; *United States* v. *Union Pacific R. Co.,* 226 U. S. 61; *United States* v. *Southern Pacific Co.,* 259 U. S. 214.

[5] *United States* v. *Reading Co.,* 253 U. S. 26, 59.

percentage of business controlled, the strength of the remaining competition, whether the action springs from business requirements or purpose to monopolize, the probable development of the industry, consumer demands, and other characteristics of the market." 334 U. S., at 527.

Quite obviously, if "bigness" alone provided a sufficient answer to the questions involved in a § 1 charge, it would be pointless to attend to the factors set out in *Columbia Steel* and reiterated here, in form approvingly but in fact without regard.

## II.

If regard be had to the criteria enumerated in *Columbia Steel,* none of them except perhaps those which deal with "bigness" favor the Government here. Although for purposes of the Sherman Act, such statistics have little meaning in the absence of a context,[6] it may be admitted that the figures in this case of *dollar volume*[7] and the *percentage of business controlled* are large. So far as these figures have relevance under the *Columbia Steel* test, they perhaps speak against the appellee.

---

[6] The presumption which the Court laid down in *Philadelphia National Bank, supra,* at 363, that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is . . . inherently likely to lessen competition substantially . . ." was concerned with the application of § 7 of the Clayton Act. Compare *Times-Picayune Pub. Co.* v. *United States,* 345 U. S. 594, 612, a Sherman Act case in which the Court noted that "no magic inheres in numbers," and quoted with approval the statement in *Columbia Steel, supra,* at 528, that "the relative effect of percentage command of a market varies with the setting in which that factor is placed."

[7] As found by the District Court, in 1960, First National had "total assets of $65,069,000, total deposits of $58,673,000 and total net loans and discounts of $35,434,000." 208 F. Supp., at 459. Security Trust, in 1960, had "total assets of $21,033,000, total deposits of $17,402,000 and total net loans and discounts of $12,317,000." *Ibid.*

On the other hand, the *strength of the remaining competition* is attested by findings of fact in the District Court, not refuted or even mentioned in the Court's opinion:

"As of December 31, 1960, there were in operation in Lexington, beside the First National Bank and Trust Company and Security Trust Company, four other commercial banks, namely:

"Citizens Union National Bank and Trust Company, with total assets of $27,876,000, total deposits of $24,569,000 and total net loans and discounts of $14,457,000;

"Bank of Commerce, with total assets of $21,230,-000, total deposits of $19,500,000 and total net loans and discounts of $12,738,000;

"Central Bank and Trust Company, with total assets of $14,930,000, with total deposits of $14,144,-000, and with total net loans and discounts of $7,799,000;

"Second National Bank and Trust Company, with total assets of $13,240,000, total deposits of $12,157,-000 and total net loans and discounts of $5,362,000.

.    .    .    .    .

"Before and since the consolidation herein referred to, all the banks in Fayette County have been operated successfully in the field of commercial banking and in competition with each other.

.    .    .    .    .

"In the trial of the case, other than the officials and employees of the defendant, First Security National Bank and Trust Company, numerous witnesses, most of whom were men of long experience in the field of banking, testified to the effect that, in their opinion, the consolidation of the two Lexington banks herein referred to would not lessen

competition in the banking field in Fayette County and did not tend to create a monopoly in that field.

"According to their testimony, the fact that the merged bank had a large percentage of the trust business of the community did not and would not substantially restrain or lessen competition in the field of commercial banking." 208 F. Supp., at 459–460.[8]

The *motive* behind the consolidation also is indicated by the findings below, similarly unchallenged, that ". . . the consolidation herein referred to clearly appears to have been the result of a lawful program of expansion on the part of the merging banks rather than an invidious scheme to restrain competition or to secure monopoly in the local field of banking." 208 F. Supp., at 460. Any doubts on this score are removed by the explicit concession of government counsel at oral argument before this Court that there is no evidence at all in the record of an anticompetitive motive behind the consolidation.

There is nothing whatever in the findings below or in the opinion of this Court pertinent to the other criteria laid down in *Columbia Steel*—the probable development of the industry, consumer demands, and other market characteristics—which supports the Court's conclusion.[9]

---

[8] The only contrary evidence, testimony of presidents of three of the four competing local banks who "expressed considerable fear that the consolidation would result in serious loss to the other banks and would be disastrous to some of them," 208 F. Supp., at 460, was discredited by the District Court. See *supra*, p. 674.

[9] With reference to the probable development of the industry, the Government turns to the past and notes that the number of local banks decreased from 10 to 7 between 1929 and 1938; but this statistic, more at home in a Clayton Act case, is of doubtful significance in the present context, particularly in view of the period during which the decrease occurred. The same may be said of the Government's reference to the testimony of the president of a competing bank that the consolidation from which his bank resulted was carried

In sum, the Court's analysis of the facts of this case ends where it begins; the conclusion that the consolidation violates the Sherman Act collapses into the agreed premise that First Security is "big."

## III.

The truth is, of course, that this is, if anything, a Clayton Act case masquerading in the garb of the Sherman Act. One can hardly doubt that it comes to us under these false colors only because the decision last Term that bank mergers could be reached under the Clayton Act was indeed a surprise to the Government. See my dissenting opinion in *Philadelphia National Bank, supra,* at 373. No one has more sympathy for the Government in this respect than I. Nevertheless, having "at the outset elected to proceed not under the Clayton but the Sherman Act," *Times-Picayune Pub. Co.* v. *United States,* 345 U. S. 594, 609, "the Government here must measure up to the criteria of the more stringent law," *id.,* at 610.

The pernicious effect of allowing the Government to change horses in midstream in fact if not quite in form [10] goes beyond this case and, in the field of banking, beyond even the revitalization of a properly moribund rule of antitrust law. In combination with the *Philadelphia National Bank* case, today's decision effectively precludes any possibility that the will of the Congress with respect to bank mergers will be carried out. The Congress has plainly indicated that it does not intend that mergers in

---

through (years before the First Security consolidation) principally to enable it "to better compete with the First National." In fact, in the three years since the First Security consolidation, there has been no further concentration.

[10] It is one thing to say, as the Court did in *Times-Picayune, supra,* at 609, that "the Clayton Act's more specific standards illuminate the public policy which the Sherman Act was designed to subserve . . . ." It is quite another thing to treat them as interchangeable. See *id.,* at 609-610.

the banking field be measured solely by the antitrust considerations which are applied in other industries. Characteristic of such indications, set out in detail in my dissenting opinion in the *Philadelphia National Bank* case, *supra,* at 374–386, is the following excerpt from the Senate Report on the bill which became the Bank Merger Act of 1960, 12 U. S. C. (Supp. IV, 1963) § 1828 (c):

> "The committee wants to make crystal clear its intention that the various banking factors in any particular case may be held to outweigh the competitive factors, and that the competitive factors, however favorable or unfavorable, are not, in and of themselves, controlling on the decision." S. Rep. No. 196, 86th Cong., 1st Sess., 24.

Adherence to the principles enunciated in *Columbia Steel, supra,* would leave room for an accommodation within the framework of the antitrust laws of the special features of banking recognized by Congress. It is difficult to see how features peculiar to banking or indeed any other features of a particular case which, in reason, should lead to a different result, can stand up against the bludgeon with which the Court now strikes at combinations which may well have no fault except "bigness."

I would affirm.