UNITED STATES of America, Plaintiff,

v.

**CARILION HEALTH SYSTEM and Community Hospital of Roanoke Valley, Defendants.**

Civ. A. No. 88–0249–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Feb. 13, 1989.

Anthony E. Harris, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

William B. Poff, Woods, Rogers & Hazlegrove, Roanoke, Va., for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

This antitrust action, brought by the U.S. Justice Department's Antitrust Division to prevent the merger of two hospitals in Roanoke, Virginia, is before the court for entry of judgment. Based on the findings of fact to follow, the court concludes that the government has failed to prove that the planned merger of the defendants would constitute an unreasonable restraint of trade under the antitrust laws and will enter judgment for the defendants.

■ The government filed this action in May, 1988, and claimed that defendants' planned affiliation would violate Sherman Act § 1, 15 U.S.C. § 1 (1982), and Clayton Act § 7, 15 U.S.C. § 18 (1982). The court dismissed the government's Clayton Act claim in September,[1] and the remaining claim under Sherman Act § 1 was tried for three weeks to the court sitting with a nine-member advisory jury between December 12, 1988, and January 17, 1989. At trial, the government contended that defendants' combination would eliminate actual and potential competition between the two defendants and would lessen competition generally to provide acute inpatient services in the Roanoke Valley. The government therefore argues that the planned affiliation would constitute an unreasonable restraint of trade, in violation of § 1, and prays the court to enjoin the merger. This court has federal question jurisdiction to hear the government's claim under 15 U.S.C. § 4 and 28 U.S.C. § 1331 (1982).

At the conclusion of the evidence, the court certified three special interrogatories

---

1. In dismissing the claim, the court noted that § 7 had two clauses, one that prohibited certain stock acquisitions, and a second that barred certain assets acquisitions by persons "subject to the jurisdiction of the Federal Trade Commission." The court found that the clause addressed to stock acquisitions did not apply to defendants because no stock was involved in their transaction. Both defendants are non-stock, nonprofit corporations. The assets clause did not apply either, the court ruled, because the FTC Act did not confer jurisdiction over nonprofit entities on the FTC. In December, on the eve of trial, the court rejected a request by *amicus curiae* Lewis–Gale Hospital, Inc., that the court reconsider its holding that § 7's assets clause did not apply to defendants' planned affiliation. Mem.Op. on Defendants' Motion for Summary Judgment at 2 n. 1 (Dec. 9, 1988).

By a motion filed during trial on January 6, the government asks the court to reconsider its ruling that § 7's stock clause does not apply to the planned affiliation. The government points out that defendant Carilion is a holding company that through the affiliation will acquire control of defendant Community. The government argues that even if Carilion cannot acquire Community's stock, if it consummated its planned acquisition of Community it would acquire Community's "share capital," thereby subjecting its transaction to § 7 scrutiny. The government points to no case, however, in which a court has applied § 7 to a merger of non-stock, nonprofit corporations, and the court again concludes that § 7's stock clause is worded so as to address only acquisitions of stock or of an interest equivalent to stock. Community, which has no private owners, has not issued, and by law cannot issue, any share capital equivalent to stock, and § 7 therefore does not govern its affiliation with Carilion. *See* Mem.Op. on Defendants' Motion to Dismiss at 3–6 (Sept. 30, 1988).

to the advisory jury.[2] The jury found the relevant service market for the government's claim to include acute inpatient hospital services and certain outpatient health care services provided by various clinics. The jury also found the relevant geographic market for the case to be "the Roanoke Valley, defined as the cities of Roanoke and Salem, Roanoke County including the Town of Vinton, and adjacent parts of Montgomery, Craig, Floyd, Franklin, Bedford and Botetourt Counties that surround Roanoke County, Virginia." Finally, the jury found that, "considering both anticompetitive and procompetitive effects," the planned affiliation would not "substantially reduce competition" in the relevant market and would not constitute "an unreasonable restraint of trade."

It now becomes the court's duty to "find the facts specially and state separately its conclusions of law thereon," Fed.R.Civ.P. 52(a), and to enter judgment pursuant to Fed.R.Civ.P. 58.

### Findings of Fact

Defendant Carilion Health System is a non-stock, nonprofit holding company that owns three nonprofit hospitals in Virginia and manages six others. The company also owns a number of for-profit subsidiaries, including a helicopter ambulance service, an eye, ear, nose and throat clinic, a pharmacy, an insurance company and a health club. Carilion's largest facility is Roanoke Memorial Hospitals in Roanoke, a facility licensed by Virginia health planning authorities for 677 acute inpatient beds, of which the hospital staffs and operates 609. Occupancy averages something less than 500 patients. Roanoke Memorial is a teaching affiliate for the University of Virginia Medical School in Charlottesville.

Carilion also owns Bedford County Memorial Hospital in Bedford, a facility licensed for 75 beds, and Radford Community Hospital in Radford, a facility licensed for 160 beds that staffs and operates about 120 beds. In addition, Carilion manages Franklin Memorial Hospital in Rocky Mount, licensed for 60 beds, Giles Memorial Hospital in Pearisburg, licensed for 60 beds, Wythe County Community Hospital in Wythe County and Tazewell Community Hospital in Tazewell County.[3]

Defendant Community Hospital of Roanoke Valley is a nonstock, non-profit corporation that owns a hospital by the same name in downtown Roanoke. The facility has 400 licensed beds of which 220 are staffed. Occupancy averages about 175 patients. Both Carilion and Community have been organized principally to provide hospital services to the general public, and both provide indigent care to the extent that funds are available. The boards of directors of both institutions are comprised in large part of business leaders from the Roanoke area who have sought to minimize health care costs to employers and patients.

Both Roanoke Memorial and Community draw more than half their patients from the Roanoke metropolitan area, including the cities of Roanoke and Salem and Roanoke County. About 53 percent of Roanoke Memorial's patients come from this area, while Community draws about 74 percent of its patients from there. If defendants' planned affiliation took place, a third facility in the Roanoke area, Lewis–Gale Hospital in Salem, would not be involved in the transaction. Owned by Hospital Corporation of America, Lewis–Gale is licensed for 406 beds, of which it operates about 335. The hospital's average occupancy is about 242. Lewis–Gale receives about 70 percent of its patients from the Roanoke area.[4]

2. The court based its jury instructions on proposals of the parties and on American Bar Association Antitrust Section, *Sample Jury Instructions in Civil Cases* at A–2 to A–8, C–6 to C–13 (1987).

3. Carilion also manages two other facilities, Southside Community Hospital in Farmville and Lonesome Pine Hospital in Big Stone Gap, but they are located outside the geographic area

considered in this case and are therefore not relevant to this action.

4. A Veterans Administration Medical Center in Salem also provides hospital care, but its services are available only to certain veterans, and in recent years it has rendered acute inpatient services to only a very limited number of patients. Defendants have not seriously contended that the hospital offers competition to other hospi-

All three of these hospitals draw substantial numbers of patients from outside the immediate vicinity of Roanoke. Roanoke Memorial draws 27 percent of its patients from an area that includes Alleghany, Bedford, Botetourt, Craig, Floyd, Franklin, Giles, Montgomery, Pulaski, Rockbridge and Wythe Counties and the cities of Lynchburg and Radford in Virginia, as well as Greenbriar, Mercer and Monroe Counties in West Virginia. The hospital treats at least 100 patients a year from each of these localities and from each of the following: Amherst, Campbell, Patrick, Smyth and Tazewell Counties and Carroll County together with the City of Galax. Roanoke Memorial receives an average of $5,000 in revenue from each patient. Community draws 18 percent of its patients from an area that includes Alleghany, Bedford, Botetourt, Craig, Floyd, Franklin, Montgomery and Rockbridge Counties and the City of Lynchburg, all in Virginia. Twenty percent of the patients who receive treatment at Lewis–Gale come from an area that includes Bedford, Craig, Botetourt, Floyd, Franklin and Montgomery Counties.

Professionals in the hospital industry distinguish among types of care various facilities provide, based on the sophistication of services they render and the seriousness and complexity of the illnesses they treat. Primary care services involve the prevention, early detection and treatment of disease. Such services include obstetrics, gynecology, internal medicine and general surgery. A hospital that limits itself to providing primary care usually has some diagnostic equipment to do X-rays and laboratory analysis. Secondary care involves more sophisticated treatment and may include cardiology, respiratory care and physical therapy. Equipment and laboratory capabilities are more sophisticated. Tertiary care is designed to arrest disease in process. It usually includes heart surgery and such cancer treatments as chemotherapy and requires still more sophisticated equipment than primary or secondary services do. Research hospitals associated with university medical schools also provide state-of-the-art quaternary level care. *See* testimony of Karl Miller, administrator of Lewis–Gale Hospital (Dec. 19, 1988).

All three of the hospitals in Roanoke and Salem provide primary, secondary and some types of tertiary care. Roanoke Memorial provides a significantly greater variety of care at this level and thus tends to treat more serious illnesses than the other two hospitals. Community, while offering some tertiary services, provides the least such care of the three hospitals.

Within its licensed capacity, Lewis–Gale has about 160 unfilled beds. While the hospital would need some time and money to again staff the 70 beds that it no longer operates, it could do so and could then take in at least about 100 more patients before its occupancy would be uncomfortably close to capacity. Hospital administrators testified that they are uncomfortable with occupancy above about 85 percent of capacity.

About 20 other hospitals within the geographic area Roanoke Memorial and, to some extent, Community serve provide primary and, in some cases, secondary level services. Besides the hospitals listed above that Carilion owns or manages, these include hospitals in Lynchburg and Galax and in Alleghany, Bedford, Carroll, Giles, Henry, Montgomery, Patrick, Pulaski, Rockbridge and Smyth Counties.

While the record does not contain specific evidence about some of these hospitals, the administrators of three testified at trial: Edgar L. Belcher of Pulaski Community Hospital, Robert D. Fraraccio of Montgomery Regional Hospital, and Walter Parmer of Alleghany Regional Hospital. Pulaski Community is licensed for 153 beds, has 103 staffed and has an average occupancy of 64 patients; Montgomery Regional is licensed for 146 beds, has 103 staffed and has an average occupancy of under 70; Alleghany Regional is licensed for 214 beds, operates 174 and has an average dai-

---

tals in the area, and the court finds that it is not relevant to an analysis of market concentration or of the likely effect on competition of defendants' proposed merger.

ly census of about 105. Montgomery Regional and Alleghany Regional are both within about an hour's drive of the three Roanoke-hospitals, while Pulaski Community is about 100 minutes away.

Each of these hospitals serves patients from the county where it is located, as well as residents of several surrounding counties. Messrs. Belcher and Parmer testified, and the court finds, that a significant number of patients from the areas those hospitals serve choose to go to the Roanoke hospitals for the same types of lower-level care available in those hospitals. In some cases, patients perceive that the services obtainable in the larger hospitals in Roanoke are superior to those offered by smaller local facilities, even for the same kinds of procedures. Community and Lewis–Gale advertise their services in the yellow pages telephone directory for Rocky Mount, Boones Mill, Ferrum, Burnt Chimney and Union Hall, as does Carilion's Franklin Memorial Hospital, and in that for Blacksburg, Christiansburg, Radford and Shawsville, where their ads appear along with others for Montgomery Regional, Pulaski Community and Radford Community.[5] Both Roanoke Memorial and Community advertise in the Clifton Forge–Covington directory along with Alleghany Regional.

These facts show that the Roanoke hospitals compete with the various hospitals in the counties that surround Roanoke to provide primary and secondary level care to patients from those areas. A patient who desires care at a hospital away from home generally must be referred to a doctor who practices near that hospital and has admitting privileges there, but this can be done with little difficulty. *See* testimony of Jeffrey Jones, M.D. (Dec. 15, 1988).

In providing tertiary care, the Roanoke hospitals do not face competition from the hospitals in surrounding counties, but several other large hospitals in Virginia and North Carolina do compete with them. Mr. Belcher testified, for example, that when patients at his hospital need more sophis-

ticated care than his hospital provides, they are referred to hospitals both in Roanoke and in Winston–Salem. Gerald Hewitt, an executive of North Carolina Baptist Hospital in Winston–Salem, testified that his hospital, which operates 625 beds and plans to expand to accomodate over 800, draws .5 percent of its patients from Bedford, Botetourt, Franklin and Floyd Counties. And the hospital draws even more patients from the southwestern portion of Roanoke Memorial's service area, including Pulaski County and Radford, and especially Galax and Hillsville. Similarly, John T. Ashley, M.D., the executive director of the University of Virginia Hospitals, testified that his institution receives a number of patients from western Virginia for tertiary care. The area in which Carilion's ambulance helicopter operates overlaps substantially with the areas covered by helicopters of several other large hospitals in Virginia and North Carolina. Based on this and other evidence in the record, the court finds that Roanoke Memorial, and to a lesser extent Community, face competition to provide tertiary services from facilities of comparable or larger size in Winston–Salem and Durham, North Carolina, and in Charlottesville and Richmond, Virginia.

Various witnesses agreed that some medical needs are treated exclusively on an outpatient basis, while others are treated only in a hospital. Most also agreed, however, that a significant number of problems could be treated either on an in or outpatient basis. Reasonable doctors differ as to when a problem must be treated in a hospital or when outpatient treatment is appropriate. Moreover, various insurance carriers, including Blue Cross and Blue Shield of Virginia, two of whose executives testified at trial, have restructured their reimbursement policies in recent years in order to encourage patients to use outpatient services, which are less expensive than inpatient care. Because patients or their doctors can choose to have problems treated either in a hospital or in an outpatient clinic or doctor's office in a significant

5. Roanoke Memorial lists itself in the Rocky Mount book but does not advertise further there. It is not listed in the Blacksburg yellow pages. A local Carilion hospital is advertised in each of these directories.

number of cases, the court finds that certain clinics and other providers of outpatient services compete with the defendants' hospitals to treat various medical needs.

New entry into the hospital market would be financially difficult. Expansion of an existing hospital, however, would cost substantially less. Expansion beyond licensed capacity would require state approval. *See Va.Code Ann.* §§ 32.1–102.1 to 32.2–102.11 (1985). Such approval is unlikely until at least July 1, when a state moratorium is scheduled to expire. However, most hospitals now staff substantially fewer beds than their licensed capacity and could expand to their full licensed quotas without obtaining state approval. Moreover, the number of problems treated on an inpatient basis has declined steadily in recent years and can be expected to continue to fall. Defendants' hospitals and their competitors can therefore be expected to have even more beds to fill within their licensed capacity, and competition for patients can therefore be expected to intensify further. And even if state ceilings did limit a hospital's capacity to accept more patients, it appears likely that Virginia will soon remove its caps on the number of beds hospitals can have. Eva. S. Teig, Virginia's Secretary of Health and Human Resources, firmly predicted at trial that Virginia would soon follow the lead of other states in deregulating the hospital industry.

Hospitals have high fixed costs, and their financial health depends on high occupancy. The court bases this finding on various evidence adduced at trial, including testimony that hospitals require a large capital investment. Testimony about the federal Medicare program also was probative on this point. To reimburse hospitals for the cost of treating Medicare patients, the Medicare program pays the hospitals an amount fixed according to each Medicare patient's particular medical problem. These fixed amounts are greater for urban hospitals than they are for rural hospitals, such as the local hospitals in the western Virginia counties surrounding Roanoke that compete with Roanoke Memorial and Community for patients who live in the vicinities of those local hospitals. Even though Medicare reimbursement levels allow rural hospitals to treat Medicare patients only by charging other patients disproportionately more for the services they receive, the local hospitals must continue to treat Medicare patients in order to maintain their occupancy and cover high fixed costs.

Because hospitals have high fixed costs, Roanoke Memorial or Community would sustain significant financial harm if either lost a significant number of patients to any of their various competitors: local hospitals in outlying rural areas that compete to provide primary and secondary services to patients who live in those areas; large hospitals in Virginia and North Carolina that compete to provide tertiary level services to patients in western Virginia; outpatient clinics and other facilities that compete to treat medical problems that might otherwise have been treated in a hospital; and Lewis–Gale.

Under defendants' planned affiliation, which defendants approved on July 30, 1987, Carilion would acquire sole membership in and ownership of Community, and Community would gain minority representation on Carilion's board of directors. Defendants want to merge in order to enhance the competitive positions of both Roanoke Memorial and Community. Roanoke Memorial needs more space in which to offer its obstetrics services and for various other clinical and administrative functions. On the other hand, Community's occupancy has declined faster than that of Roanoke's other hospitals. Community has extra space and needs more patients. Defendants plan to consolidate all obstetrics and other clinical services of both hospitals at Community. The merger also can be expected to help the two hospitals strengthen and expand joint operations, which already have begun in the areas of data processing and laundry. Credible testimony at trial satisfies the court the merger will produce capital avoidance and other clinical and administrative efficiencies that will save the two hospitals at least $40

million over the first five years of the affiliation.

In response to defendants' announcement of their merger plans, Lewis–Gale lowered its patient rates and has begun considering a joint venture with an adjacent clinic of over 100 physicians. As an aspect of the venture, the hospital and clinic are considering an affiliation with a regional medical school, such as Bowman Gray School of Medicine in Winston–Salem, to rival Roanoke Memorial's affiliation with the U.Va. Medical School. The hospital continues to expand its tertiary care offerings to compete with Roanoke Memorial. Lewis–Gale opposes defendants' merger, however. Lewis–Gale also retains ties to two smaller hospitals in the area where it competes with defendants' hospitals, Montgomery Regional and Pulaski Community. Hospital Corporation of America, Lewis–Gale's owner, retains a minority stake in the parent company of these two smaller hospitals. HCA also manages another area hospital, Alleghany Regional.

Based on expert testimony, the court also finds that as a general rule hospital rates are lower, the fewer the number of hospitals in an area. In addition, charitable, nonprofit hospitals tend to charge lower rates than for-profit hospitals. Relative to other products and services consumers buy, hospital services are not price sensitive in a relevant market. Finally, the Virginia Health Services Cost Review Council can be expected to use effective persuasive power to keep hospital rates relatively low in western Virginia. While the Council's official powers are hortatory, hospitals and the press closely watch its publication of hospital rates.[6]

In conclusion, the court finds that the planned merger would probably improve the quality of health care in western Virginia and reduce its cost and will strengthen competition between the two large hospitals that would remain in the Roanoke area. Defendants' boards of directors could be expected to help insure that savings realized from the affiliation will be passed on to consumers.

### Conclusions of Law

■ The government brings this action under Sherman Act § 1, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal...." 15 U.S.C. § 1 (1982). While "any commercial contract" could be deemed to be a restraint of trade that violates the provision, courts use a "'rule of reason' analysis for determining whether most business combinations or contracts violate the prohibitions of the Sherman Act." *United States v. Topco Associates, Inc.*, 405 U.S. 596, 606–07, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). Whether a particular combination is unreasonable depends on such factors as "the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reason for its adoption." *Id.* at 607, 92 S.Ct. at 1133.

Some business relationships have such a "pernicious effect on competition" and are so lacking in "redeeming virtue" that the courts presume them to be unreasonable without investigating their possible benefits each time they occur. *Id.* (quotation omitted). Mergers, however, are not among those commercial practices which have been declared unreasonable *per se.* The Supreme Court has recognized that "[m]ergers among competitors eliminate competition, including price competition, but they are not *per se* illegal, and many of them withstand attack under any existing antitrust standard." *Broadcast Music v. CBS, Inc.*, 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979). The court therefore will analyze the facts it has found under the rule of reason standard.[7]

---

**6.** The court cannot credit expert testimony proffered by the government to the effect that defendants' merger is likely to raise hospital rates. Government witness David S. Salkever did not explain the basis of his findings to the court's satisfaction, and another witness, economist David M. Eisenstadt, raised serious questions about Dr. Salkever's method of analysis. The court therefore finds Dr. Salkever's prediction to be of little probative value.

**7.** Prior to trial, defendants moved the court to dismiss the government's claim without preju-

In analyzing a merger under § 1, the court must evaluate the percentage of business the new merged entity would control, "the strength of remaining competition, whether the action springs from business requirements or purpose to monopolize, the possible development of the industry, consumer demands, and other characteristics of the market." *United States v. Columbia Steel Co.*, 334 U.S. 495, 527, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948).[8]

#### Relevant Market

The government challenges the effect of defendants' merger on competition to provide acute inpatient hospital services in the Roanoke Valley. To determine the percentage of business the merged entity would control and the strength of remaining competition, "[i]t is first necessary to delimit the market in which the concerns compete" to provide inpatient services. *Id.*

Based on the finding above that providers of outpatient services compete with providers of inpatient services for the same patients in a significant number of cases, the court concludes that the relevant service market for this case includes not only other inpatient hospitals but also various outpatient clinics that treat medical problems for which patients might otherwise have sought treatment in an inpatient hospital setting.

Based on the finding above that the Roanoke hospitals compete with hospitals in surrounding counties to provide primary and, in some cases, secondary services to residents of those counties, the court concludes that all those areas are included in the relevant geographic market for this case with respect to primary and secondary services. Specifically, the market includes all the counties and cities from which Roa-

---

dice on grounds that it was not ripe for adjudication. The court already has concluded, however, that the Supreme Court in 1948 and again in 1964 unanimously accepted the propriety of courts' scrutinizing a planned merger or acquisition under § 1 before it has been carried out. *United States v. First National Bank & Trust Co. of Lexington*, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); *id.* at 673, 84 S.Ct. at 1038 (Brennan & White, JJ., concurring in the judgment); *id.* at 673–80, 84 S.Ct. at 1037–42 (Harlan, J., dissenting); *United States v. Columbia Steel Co.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *id.* at 534–40, 68 S.Ct. at 1127–30 (Douglas, J., dissenting). Moreover, the antitrust cases defendants cite to support their contention are inapposite. *Volvo North Am. Corp. v. Men's Prof. Tennis Council*, 857 F.2d 55 (2d Cir.1988), involved, among other matters, an antitrust challenge to a tennis association's proposed rules. The court held that the rules would not be ripe for challenge until the association had definitely decided to adopt them, unless the claimants could show that the mere fact that they were being considered was itself having an anti-competitive effect. *Id.* at 64–65. Defendants' plan to affiliate, by contrast, is definite and can be expected to be carried out unless the government obtains the relief for which it prays. *Appalachian Coals, Inc. v. United States*, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933), differs from this case also in that the joint selling arrangement at issue there presumably could have been discontinued by court order more practicably than a merger, once consummated, can be diseffectuated.

**8.** In *United States v. First Nat'l Bank & Trust Co. of Lexington*, 376 U.S. 665, 672–73, 84 S.Ct. 1033,

1037–38, 12 L.Ed.2d 1 (1964), the court stated that *Columbia Steel Co.'s* holding, that the acquisition in question did not unreasonably restrain trade, turned on the "special facts" of the case. This court summarized the facts of *Columbia Steel* in its Memorandum Opinion on Defendants' Motion for Summary Judgment at 8–9 (Dec. 9, 1988). A § 1 analysis takes into account the characteristics peculiar to the industry considered. The Supreme Court thus found in *First Nat'l Bank* that the banking industry considered there differed from the steel industry considered in *Columbia Steel*, and so the court applied different weight to the relevant factors in *First Nat'l Bank* than it had in *Columbia Steel*. The court went on in *First Nat'l Bank* to quote without disapproval the language of *Columbia Steel* which this court uses as guidance in undertaking its § 1 analysis. 376 U.S. at 672, 84 S.Ct. at 1037. By that language, the court only adapted to the context of a merger general principles of a § 1 analysis that the court has enunciated more recently in such cases as *Topco Assoc., Inc., supra.*

In light of the Supreme Court's discussion of mergers in *Broadcast Music*, discussed above, this court concludes that *First Nat'l Bank* should not be read to stand for the proposition that § 1 prohibits any merger between "major competitive factors in a relevant market." 376 U.S. at 673, 84 S.Ct. at 1037. By quoting *Columbia Steel*, the court indicated that, as in any rule of reason analysis, courts must weigh various factors, some peculiar to the industry under consideration, in analyzing a merger under § 1. *But cf. United States v. Third Nat'l Bank in Nashville*, 390 U.S. 171, 181, 88 S.Ct. 882, 889, 19 L.Ed.2d 1015 (1968).

noke Memorial draws at least 100 patients a year. This area is comprised of 16 counties and three independent cities of Virginia and three counties of West Virginia. Competitors to provide primary and secondary services in the relevant geographic market include not only defendants and Lewis-Gale but nearly 20 hospitals in the counties and cities that surround Roanoke, including a relatively large institution in Lynchburg, as well as relevant outpatient clinics throughout those areas.

Based on the finding above that hospitals in central Virginia and northern Carolina compete with defendants and Lewis-Gale to provide tertiary level services to the same residents of western Virginia that the three Roanoke hospitals serve, the court concludes that for tertiary level services the relevant geographic market includes hospitals in Charlottesville and Richmond, Virginia, and in Winston-Salem and Durham, North Carolina.[9] For these reasons, the court must reject the advisory jury's finding as to the relevant geographic market.

### Reasonableness of Restraint

The government argues that defendants' merger would give Roanoke Memorial and Community a market concentration of over 70 percent, based on share of patient occupancy. The court must reject this calculation, however, as it is based on market assumptions that the court cannot accept. The record does not allow the court to produce a concentration figure because the size and occupancy of many of the hospitals in the market were not disclosed at trial. However the market is defined, the merger would doubtless give Carilion a larger market share than it now enjoys. When the various hospitals in the market area surrounding Roanoke are included, however, defendants' market share, even adjusted for the six other hospitals in the market that are owned or managed by Car-

ilion, cannot be expected to approach the estimates advanced by the government. The market share is further reduced by the share of patients drawn away by large research hospitals in central Virginia and northern North Carolina and by various outpatient clinics throughout the geographic market.

In any case, "[t]he relative effect of percentage command of market varies with the setting in which that factor is placed." *Columbia Steel Co., supra,* 334 U.S. at 528, 68 S.Ct. at 1124. The court has found that defendants rely for their financial health on filling their beds with various patients who, even after defendants' merger, could turn to one or more other providers for care. These include residents of outlying areas who could go to hospitals near their homes rather than going into Roanoke, patients needing tertiary care who could get it at various hospitals in central Virginia and northern North Carolina and persons who could have their problems treated on an outpatient basis. More importantly, Lewis-Gale, which plans to increase its tertiary service offerings and is considering an affiliation with a major medical school in the region, promises to be a major competitor. The hospital's 160 legally available beds can be expected to put substantial competitive pressure on the merged Carilion hospitals as the number of patients who are hospitalized anywhere continues to decline. The continuing decline in the number of patients in the market increasingly reduces the importance of state legal restraints on hospital expansion, restraints which themselves appear likely to be removed. Financial and legal barriers to expansion by existing hospitals therefore cannot be viewed as prohibitive, and so defendants' various competitors in the geographic market would be able to expand their capacity if necessary

9. Community does not now provide as many tertiary level services as Roanoke Memorial or Lewis-Gale. As a large hospital, the facility nevertheless might conceivably be regarded as a potential competitor to provide services it does not yet offer. The steady and severe decline in patient base Community has suffered in recent years, however, renders doubtful that it would

be able, absent a merger, to add tertiary level services at the same rate as Roanoke Memorial or Lewis-Gale. For this reason, the court puts less weight on the proposed merger's effect on potential competition between Roanoke Memorial and Community to provide tertiary level services as it does on the merger's effect on actual competition between the two institutions.

in order to compete more vigorously with defendants. The strength of remaining competition and the ease with which remaining competitors can further challenge defendants thus outweighs the increased market share defendants would acquire through their combination.

Also relevant is the fact that defendants seek to merge in order to strengthen, rather than reduce, competition. Based on Roanoke Memorial's serious need to expand and Community's need for more patients, they have found various ways in which more efficient operations can save money and thereby enable them to offer their services more competitively than ever, to patients' benefit. Greater competitiveness—in both prices charged and the quality of services offered—serves to benefit both patients and those who pay for their health care. That business requirements and consumer demand, rather than a monopolistic design, motivate defendants' intention to merge argues strongly in favor of the planned merger's reasonableness.

Defendants' nonprofit status also militates in favor of finding their combination reasonable. Defendants' boards of directors both include business leaders who can be expected to demand that the institutions use the savings achieved through the merger to reduce hospital charges, which are paid in many cases by employers, either directly or through insurance carriers. Defendants concede, of course, that Sherman Act § 1 applies to nonprofit entities. Leading cases on the subject, however, do not address nonprofit entities' charitable activities. *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), involved the televising of college football games in order to raise money for the schools whose teams were broadcast. The schools' charitable educational activities were not at issue. Similarly, *Goldfarb v. Virginia State Bar Ass'n*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed. 2d 572 (1975), and *Am. Soc. of Mechanical Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), both involved anti-competitive rules promulgated by associations of profit-making professionals. Without deciding whether defendants' nonprofit status should exempt their merger from § 1 scrutiny, the court concludes that their nonprofit status weighs in favor of their merger's being reasonable.

The court therefore adopts the jury's finding as to the reasonableness of defendants' planned merger and finds that the merger would not constitute an unreasonable restraint of trade under Sherman Act § 1. The court will therefore enter judgment for the defendants and must deny the injunctive relief the government seeks. The court will enter an appropriate order this day.